Nott, J.,
delivered the opinion of the court:
In the case of the Delaware Indians v. The Cherokee Nation (28 C. Cls. R., 281; 155 U. S. R., 196) three things were determined. The first was that the lands of the nation are public property *149 in the same sense that the lands of the United States are public property, and not communal property of native Cherokees. The second was that the Delawares were entitled as citizens by adoption to participate in the distribution of the proceeds of the public domain equally with native Cherokees. The third was that statutes enacted by the national council which discriminate against Delawares by distributing the proceeds of the public domain exclusively among “ Cherokees by blood” are to that extent and as against the Delawares unconstitutional and void.
The present suit represents another class of adopted Cherokee citizens — the freedmen of the nation. Their case varies somewhat from that of the Delawares, but rests on the same constitutional provisions, those adopted in 1866, which are in these words:
“Sec. 2. The lands of the Cherokee Nation shall remain common property until the national council shall request the survey and allotment of the same, in accordance with the provisions of article 20th of the treaty of 19th of July, 1866, between the United States and the Cherokee Nation.
“Sec. 5. No person shall be eligible to a seat in the national council but a male citizen of the Cherokee Nation, who shall have attained totheageof twenty-fiveyears, and who shall have been a bona fide resident of the district in which he may be elected at least six months immediately preceding such election. All native-born Cherokees, all Indians, and whites legally members of the nation by adoption, and all freedmen who have been liberated by voluntary act of their former owners or by law, as well as free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months from the 19th day of July, 1866, and their descendants who reside within the limits of the Cherokee Nation, shall be taken and deemed to be citizens of the Cherokee Nation.” '
But there were two elements in the case of the Delawares which were considered in connection with the above provisions, and may have aifected the interpretation given to the constitution. The first was the Treaty 19th July, 1866 (14 Stat. L., p. 799), between the United States and the Cherokee Nation which preceded and induced the constitutional amendments above set forth; the second, the treaty or agreement, 8th April, 1867, between the Cherokee Nation and the Delawares, by virtue of which the latter entered into and became a part of the nation.
*150 At the close of the civil war the Cherokee country was virtually conquered territory, and the Cherokee Nation at the mercy of the United States. ■ As a condition to peace and the continued existence of the nation as a government, the United States insisted, among other things, that certain Indian tribes might be incorporated into and form a part of the body politic, or at least be removed into the. Cherokee country. This condition was agreed to and embodied in the treaty. But at the same time there were limitations set upon the obligation — the “civilized Indians friendly with the Cherokees’7 who were so to be brought in were to pay “into the Cherokee national fund a sum of money which shall sustain the same proportion” to the then existing national fund “ that the number of Indians sustained to the whole number of Cherokees” then residing in the Cherokee country; and their settlement in the Cherokee country was not to be altogether a matter of right, but “ on such terms as may be agreed upon by any such tribe and the Cherokees, subject to the approval of the President of the United States” and consistent with the terms of the treaty.
Pursuant to the intent of the treaty, the Cherokees and the Delawares did enter into such an agreement 8th April, 1867. The Cherokees agreed “to sell to the Delawares for their occupancy a quantity of land east of the line of the 96° west longitude, in the aggregate equal to 160 acres for each individual of the Delaware tribe who has been enrolled upon a certain register made February 18, 1867.” And they further agreed that “ the selections of the lands to be purchased by the Delawares may be made by said Delawares in any part of the Cherokee Reservation east of said line of 96° not already selected and. in possession of other parties.” The Delawares on their part agreed to pay for these lands “ a sum of money equal to $1 per acre for the whole amount of 160 acres of land for every individual Delaware.” They also agreed “that there shall be paid from their funds now or hereafter to come into possession of the United States a sum of money which shall sustain the same proportion to the existing Cherokee national fund that the number of Delawares, registered as above mentioned and removing to the Indian country, sustains to the whole number of Cherokees residing in the Cherokee Nation.”
The treaty also provided that the “friendly Indians,” who might abandon their tribal organization and remove into the *151 Cherokee country, “shall be incorporated into and ever after remain a part of the Cherokee Nation, on equal terms in every respect with native citizens.” And the agreement with the Delawares went still further and provided:
“ On the fulfillment by the Delawares of the foregoing stipulations, all the members of the tribe registered as above provided shall become members of the Cherokee Nation, with the same rights and immunities, and the same participation (and no other) in the national funds as native Cherokees, save as hereinbefore provided.
“And the children hereafter born of such Delawares, so incorporated into the Cherokee Nation, shall, in all respects, be regarded as native Cherokees.”.
The freedmen did none of these things. In 1866 they were, or had been, inhabitants of the Cherokee country-. The treaty created for them new rights, “the right to settle in and occupy,” with others, a designated district; the right with the other inhabitants of the district “to elect all their local officers and judges” and “to control all their local affairs” not inconsistent with the constitution of the nation; and to representation in the national council. The treaty also secured for them the guaranty that “all laws of the Cherokee Nation shall be uniform throughout said nation” and that the freedmen “and their descendants shall have all the rights of native Cherokees.” The freedmen entered into no agreement; they were not parties to the treaty; they paid nothing for the homes they acquired and they contributed nothing to the national fund in the custody of the United States. Neither did the Cherokees enter into an express agreement with them, as with the Delawares, that they should become members of the Cherokee Nation “ with the same rights and immunities,” and “ the same participation in the national funds as native Cherokees,” and that their children thereafter born “should in all respects be regarded as native Cherokees.”
The freedmen now seek a decree awarding to them their proportionate share in the avails of the “public domain” as if they were native Cherokees and “in and to all and singular the moneys, lands, and other property of the Cherokee Nation.” The counsel for the defendants contend that a distinction can be drawn between this case and that of the Delawares; that the rights of the freedmen in the Cherokee *152 Nation are political and not communal$ that they acquired no right of property under the treaty except that of possessing 160 acres each.
Here it should be noted that when the treaty was made there had long been a peculiar class of citizens in the Cherokee country — white men who became citizens by intermarriage. Concerning them Cherokee law had declared that if one be left a widower he should continue to enjoy the rights of citizenship unless he should marry a person “having no rights of Cherokee citizenship by blood.” Also, that if one should abandon his wife he should “thereby forfeit every right and privilege of citizenship and be removed from the nation.” There was also a significant provision attached to the law allowing citizenship by intermarriage, which was in these words:
“Provided, also, That the rights and privileges herein conferred shall not extend to right of soil or interest in the vested funds of this nation, unless such adopted citizen shall pay into the general fund of the national treasury a sum of money, to be ascertained and fixed by the national council, equal to the ‘ pro rata ’ share of each native Cherokee in the lands and vested wealth of the nation, estimated at five hundred dollars.” (Code, p. 224.)
The idea therefore existed, both in the mind and in the laws of the Cherokee people, that citizenship did not necessarily extend to or invest in the citizen a personal or individual interest in what the constitution termed the “ common property,” “ the lands of the Cherokee Nation.” In accordance with this idea the national council, by an act approved April 27,1886, entitled “An act of construction of the rights of Cherokee citizenship as designed to be conferred upon the freedmen and friendly Indians by the ninth and fifteenth articles of the treaty of 1866,” enacted and declared as follows:
“That the phrase ‘all the rights of native Cherokees,’ as used in the 9th and 15th articles of the treaty of July 19th, 1866, between the United States and this nation, is hereby construed to mean the individual rights, privileges, and benefits enjoyed by white adopted citizens of this nation before and at the making of said treaty, and who had been by law admitted to ‘ all the rights of a native Cherokee, civil, political, and personal,’ as subjects of the Cherokee Nation of Indians, without acquiring any right or title to the Cherokee domain, or to the proceeds thereof, when made subject to a division among *153 those to whom such domain had been conveyed, all the rights of the lands held and owned by this nation, and to the principal of the proceeds thereof when realized, being reserved by and to the original Cherokee owners, as in the case of white adopted citizens aforesaid, subject to be conveyed or granted only at the option of said owners or for value received, according to agreements provided to be made with friendly Indians in conformity with the 15th article of said treaty.”
The fact is that from the constitution of 1837 to this statute of 1886 there were two inconsistent principles operating in the affairs of the Cherokee people. The common mind clung to the hereditary idea that the lands of the Cherokees are communal, and, like all communal lands, heritable, descending with the blood of the owners. And the constitution left the communal character of the lands, so far as individual ownership was involved, unchanged. No titles in fee simple existed or could exist; the citizen had but the right of occupation; the right of occupation was heritable, but inalienable; when occupancy ceased the right of occupation expired. So far as appearances went the lands continued to be the common property of the Cherokee people — of the people who had inherited them from their Cherokee fathers — of the people who were “Cherokees by blood.” That alien tribes admitted within the bounds of Cherokee territory would thereby become joint owners in their own common property in their lands, occupied or unoccupied, was unanticipated by the mass of the people. Still less was it anticipated in 1866 that their former servants and bondmen, then admitted to free homes within the Territory would one day claim that by virtue of that admission they had become coequal owners with the Cherokees who were Cherokees by'blood in the vast domain of .their unoccupied lands. It was no more thought that these strangers would be admitted to share in the unoccupied lands of the Cherokees than in their cultivated fields. To allow them to dwell within their Territory and vote and be called Cherokee citizens and enjoy political rights was one thing; to give them an equal share with themselves in their own exclusive, though undivided, property was another. The communal idea, too, had been kept alive until 1866 by the national fund in the Treasury of the United States. Had not Cherokees by blood, and by blood only, received annuities'? Was not that fund derived from the sale of their lands'? If they had sold all of their *154 unoccupied lands before the intrusion of the Delawares and freedmen would not the national fund have been immensely larger and would not their annuities have been proportionately greater? Moreover, had there not been strangers in the Cherokee country ever since the time when the nation was .forcibly brought from its territory in Georgia — white men who were allowed to live and occupy and intermarry — but had it ever been asserted by these intruders, or by the United States on their behalf, that they could share in the annuities or lay claim to the proceeds of the lands ?
Nevertheless, a conflicting principle had been embodied in the supreme and statute law of the Cherokees. By the adoption of the constitution in 1837 the title of the common property passed from the communal owners and became vested in the newly founded government of the nation. The character of the communal owners also changed. They became, and thenceforth were to be, simply “ citizens; ” citizens whose rights were defined and limited by their constitution and their laws. The constitution does indeed declare that “ the lands of the Cherokee Nation shall remain common property,” but other provisions show that this one meant that the soil, whether occupied or unoccupied, was never to become individual property, and that the estate of the citizen in the realty which he possessed was always to be limited to a right of occupancy. Communal property and communal owners gave place to “the public domain” and to “citizens of the Cherokee Nation.”
The counsel for the defendants have pressed upon the court with great force and earnestness the argument that the idea of communal property is and always has been inborn with the Indian, and that, the Cherokees never could have intended to admit the freedmen to other than political rights. It is said :
“There is and can be no analogy between the Cherokee Nation and the United States or a State in respect to the public national possessions. We can not imagine such a thing as a sale of our public domain for the purpose of distributing the proceeds pro rata among the ‘ citizens.’ No such transaction was ever dreamed of. But it always has been, and is to-day, the central idea of the Indian, whether wild, half civilized, or civilized. There has not been a session of Congress in a century that legislation has not been enacted looking to the purchase of Indian lands or extinguishment of Indian titles and payment, in some form, to the individual members of the tribe *155 or tribes making the cessions. Some payment, per capita, is the almost invariable accompaniment of the transaction, down to the present movement, and so tenacious are they of this idea that without it the effort to negotiate treaties would be a futile undertaking.
“Holding these ideas of their common lands and property, following the traditions of centuries, as well as being prompted by self-interest, it is incredible that the Cherokees intended to give away interests equal with their own, in all their lands and wealth, the inheritance of their fathers, and this not only to the former slaves of some of their citizens, but to all colored persons who happened to be in their country at the close of the war.”
But the court carefully considered this question of communal property in the previous case of the Delawares, and that decision has been affirmed by the Supreme Court. It was there held that while all Indian lands were originally comn unal, the fee being vested in the community as such with a mere right of occupancy in members of the community regulated and restricted by custom, in the Cherokee country the control has passed from the communal owners and beco me lodged in the State, and the unoccupied lands or “public domain,” analogous to the public lands of the United States, is held absolutely by the Government as a trust for governmental purposes and the general welfare. The facts that the freedmen did not pay for the homes which they acquired,- that they did not contribute to the national fund; that they did not come into the nation by virtue of an express agreement; that their foothold was acquired exclusively through the interposition of the United States, and exclusively by virtue of the treaty of 1866, are facts which operate against the equity of their case, but do not take their legal rights out of the safeguard of the constitution, or the obligations of the treaty. When the Cherokee people wrote into their constitution in 1866 “ all native-born Cherokees, all Indians and whites legally members of the nation by adoption, and all freedmen,” “shall be taken and be deemed to be citizens of the Cherokee Nation,” they fixed the status of the freedman and raised him to the same rank of citizenship which they themselves enjoyed. Thenceforth he was to be equal with themselves under the constitution, governed by the same laws, enjoying the same rights, possessed of the same immunities, and entitled to the same protection. *156 If the common property was to be retained for the general welfare, he was to share equally in its benefits; if it was to be sold and its proceeds divided, the constitution made it as much his as theirs.
The court appreciates the earnest argument of the counsel for the defendants that this result could not have been anticipated by the Cherokees when they ratified the treaty of 1806, and the court has heretofore anticipated the counsel in an expression of the same opinion (28 C. Cls. R., 317). The result indeed was not anticipated. If the Cherokee Nation had grown and the national territory had been filled according to the ordinary law of empires, by natural increase and immigration, this vexed question would never have been heard of; or if a portion of the public domain had been sold and the proceeds had been applied to governmental purposes, the freed men sharing with the Cherokees equally in the benefits accruing therefrom, no one would have quarreled with the result. The trouble has come from the fact that, to quote the language of the previous opinion, “ the Cherokees are selling the heritage of their fathers and the patrimony of their children, and dividing the money among the present generations — that is, among themselves — instead of funding it as a part of their national resources for the welfare of those who are to come after them.” The Cherokees did not foresee that this radical change of conditions would take place; neither did the Delawares and the freedmen. If it had been foreseen, the one party might have stipulated that the proceeds of the property should go exclusively to themselves who were Cherokees by blood. But the other party might-also have stipulated that the public domain of the nation of which they ■ were about to become citizens should not be squandered in this way, and should remain what it then was, the common property of all.
It is also urged by the counsel for the defendants and with great force that the sovereignty of the Cherokee Nation has always been and is now recognized by the United States; and that as a sovereign power it has the inherent right to administer its internal affairs in its own way and to regulate the rights of its citizens by its own laws. It is said :
“That the Cherokees possess the sole and exclusive right to manage their own internal affairs and of control of the persons and property of their citizens there has been no question for *157 more than half a century, and this right has been recognized by the Government of the United States by an unbroken current of precedents through all this time.
“So,'if we admit for the sake of argument that the freedmen, under the treaty of ?66, have an interest in all the common property of the Cherokee Nation, that nation, under the decisions of this court and the Supreme Court, the opinion of the Attorney-General and the Secretary of the Interior, has a perfect right to make such disposition of its lands and moneys as it may see fit and proper, whether affecting members by blood or adoption, and there is no right or power vested or reserved in the United States to interfere. As a matter of fact, if we apply the principles laid down by the courts, the Attorney-General and the Secretary of the Interior, which recognize the absolute unrestricted right of self-government in the Cherokee Nation as to its internal affairs, and the right guaranteed to that nation ‘ to make and carry into effect all such laws as they may deem necessary for the government of the persons and property within their own country belonging to their own people or such persons as have connected themselves with them,’ then the United States Government has no more control over the public property of that nation or the action of its legislature in connection therewith than it has over the public property or legislative acts of a State or Territory.”
These propositions are in the abstract sound — are indeed incontrovertible. But the trouble with their application to the present case is, first, that the legislative authority of the national council is not absolute, but is limited and defined by the constitution of the nation; second, that its action can not control or abrogate the treaty obligations of the nation to the United States.
The United States did not, it may be conceded, stipulate for more than that the freedmen should become citizens “ with all the rights,” that is, political rights, “ of native Cherokees,” and that “all laws of the Cherokee Nation shall be uniform throughout said nation,” and that the President of the United States should have the power to secure to the freedmen “ a fair and equitable application and expenditure of the national funds;” but the constitution of the Cherokee Nation then came into the case and defined what citizenship was, and in express terms ranked “freedmen” with “native-born Cherokees,” and the lands of the nation as “ common property.” If those lands had remained common property, unsold, and held for governmental purposes, it seems incontrovertible that all classes of citizens, *158 Cherokees by blood and Cherokees by adoption, would have been, as citizens, equally and mutually entitled to the national benefits which might be derived from them. And to the court it seems equally incontrovertible that when the national council saw fit to change the lands into money, the fund took the place of the lands and was subject to the same limitations and existed for the same beneficiaries. Primarily it existed for national purposes, the construction of roads, the erection of public buildings, the endowment of schools, and the abatement of taxation — for those objects which are comprehended in the term “the general welfare.” The national council did not and could not divert the common property of the nation from the general welfare and transmute it, at will, into a communal fund belonging to a class of citizens. If the fund retained the characteristic of the lands, that of common property, it necessarily was the common property of all.
It is possible that there still exists, or hereafter may be revived, á species of property which is an exception to the previously expressed conclusions of the court. To prevent future misapprehension and complication, this will now be noted.
The United States have repeatedly recognized in their transactions with the Cherokees the dual character of the people, sometimes national, sometimes communal. They have also recognized portions of the people as distinct communities. In 1835 they so dealt with the Georgia Cherokees as communal owners, setting apart a portion of the purchase money of their lands for national purposes, but paying part to them per capita. In 1846 they so dealt with the Western Cherokees, segregating them from the mass of their countrymen and paying them individually, a community within a community. In 1866, and by the very treaty which lies at the foundation of this suit, they recognized the Delawares as communal owners of a fund in the Treasury. For though the Delawares were to be merged in the Cherokee Nation and become Cherokee citizens, and contribute to the Cherokee fund, nevertheless there was to remain in the Treasury a portion of the Delaware fund which would not pass to the nation for national purposes, but would continue to be the separate property of a people who were no longer to be a body politic, a nation, but who, so far as the ownership of the fund was concerned, were still to be communal owners. Still later the United States have recognized the continued exist- *159 erice of these communities by allowing them to bring actions in this court in regard to their communal property. (Eastern Cherokees v. The United States, 26 C. Cls. R., 449; Western Cherokees v. Same, 27 id., 1; Shawnees v. Same, 28 id., 447; Delawares v. Cherokee Nation, 28 id., 281.) The claimants now ash the court to decree that thefreedmen are entitled.to participate with all the other members of the nation in all of the remaining common property upon equal terms with the other members of the nation. The court is not informed whether there still exists funds or annuities which were originally treated as communal by distribution per capita and not as national by being set apart for school purposes, charitable uses, etc. If there should be such a fund, it is the opinion of the court that its original character continues, and that it must be regarded as belonging to that community or portion of the Cherokee people who are or were entitled to be paid its proceeds per capita, whether they were those formerly known as Western Oh erokees, Delawares, and Shawnees, or those now known as “Oherokees by blood.” Payment per capita must be regarded as the badge or recognition of an individual communal interest as distinguished from a governmental or national ownership. Such funds are not “ common property” within the intent of the Cherokee constitution, but trust estates in the custody of the United States for the benefit of designated individuals or communities. Over them the Cherokee government has no legitimate control, and in them the freedmen have no estate or interest.
The agreed statement of facts upon which the case has been considered sets forth the various funds which have been distributed in whole or in part among those who are “Oherokees by blood,” but does not inform the court of the number of persons who were entitled to participate, or of the number of persons who constitute the body of the present claimants. Until that information is spread before the court a final decree determining definitely the rights and liabilities of the parties litigant can not be entered. The court will entertain the suggestions of counsel as to how the requisite information shall be obtained; and in the meantime, and until the further order of .the court, the entry of judgment is suspended.