Peeule, Ch. J.,
delivered the opinion of the court.
The questions now presented relate to the enrollment of those Eastern Cherokee Indians, parties to the treaty of 1835-36 (7 Stat. L., 478, 488) and 1846 (9 Stat. L., 871), who are entitled to share in the money appropriated by Congress to satisfy the judgment and decree entered by the court in favor of the Cherokee Nation May 18, 1905, as modified May 28, 1906, to conform to the mandate of the Supreme Court affirming said judgment, but directing that the distribution be made to s.aid Eastern Cherokees as individuals, exclusive of the Old Settlers.
The special commissioner appointed to make the roll under the decree and instructions of the court, having filed his report herein recommending those who, in his judgment, should be enrolled and those who should not be, and sundry exceptions having been filed by those recommended for rejection, the question is, Shall they be added to the roll ?
The original suit- arose in the main under the treaty of 1835-36, by the terms of which the parties thereto claimed that the expenses of their removal to the Indian Territory should be borne by the United States.
The findings and opinion relating to the whole case are reported in 40 Court of Claims Reports, page 252, and need not be repeated here.
There were three minor claims in favor oj: the Cherokee Nation not material here. The claim designated as item two in the decree for $1,111,284.70, with interest thereon at 5 per centum from June 12, 1838, to date of payment, is the only one here involved; and in respect' thereto the original decree, after providing for the payment of attorneys’ fees and the expenses of making the roll, provided:
“ Second. The remainder to be distributed directly to the Eastern and Western Cherokees, who were parties either to *231 the treaty of New Echota, as proclaimed May 23, 1836, or the treaty of Washington of August 6, 1846, as individuals, whether east or west of the Mississippi River, or to the legal representatives of such individuals.”
The case was appealed to the Supreme Court by the respective parties (202 U. S., 101, 130), and in relation to said item two the court, among other things, said: “ We concur with the Court of Claims in the wisdom of rendering judgment in favor of the Cherokee Nation, subjéct to the limitation that the amount thereof should be paid to the Secretary of the Interior to be distributed directly to the parties entitled to it, but we think that the terms of the second subdivision of the fourth paragraph of the decree, in directing that the distribution be made to ‘the Eastern and Western Cherokees,’ are perhaps liable to misconstruction, although limited to those ‘who were parties either to the treaty of New Echota, as proclaimed May 23, 1836, or the treaty of Washington of August 6, 1846, as individuals, whether east or west of the Mississippi River.’ This should be modified so as to direct the distribution to be made to the Eastern Cherokees as individuals, whether east or west of the Mississippi, parties to the treaties of 1835-36 and 1846, and exclusive of the Old Settlers.”
Hence, upon the coming in of the mandate of the Supreme Court the original decree was modified May 28, 1906, in accordance therewith, directing “ the distribution of the fund described in item two of said decree to be made to the Eastern Cherokees as individuals, whether east or west of the Mississippi, parties to the treaties of 1835-36 and 1846, and exclusive of the Old Settlers.”
This is the material part of the final or modified decree directed by the mandate of the Supreme Court respecting the distribution of the fund to the Eastern Cherokees as individuals, the remaining portions thereof, whenever entered, being in the nature of orders directed to the enrolling officer in exemplification of the decree. That is to say, when the Secretary of the Interior was directed to prepare a roll for the distribution of the fund arising from the judgment he was directed to accept as a basis therefor the rolls of *232 1851, ujjon which the per capita payments to the Eastern Cherokees had been made.
Thereafter when the Secretary, by letter bearing date April 10, 1907, referred back to the court the matter of making up the roll, with a request that the court supervise the same, and petitions were filed by Henry C. Meigs and others to the same effect, the court vacated its order directing the Secretary of the Interior to prepare the roll and resumed the supervision thereof itself; and for that purpose employed Guión Miller, esq., who had previously been employed by the Secretary of the Interior for the same purpose, at which time he was instructed to enroll all “ such individual Eastern Cherokee Indians by blood living on May 28, 1906, as shall establish the fact (1) that they were members of the Eastern Cherokee tribe of Indians at the date of the treaties of 1835-36 and 1846, or are descendants of such persons, and (2) who shall further establish the fact that they have not affiliated with any tribe of Indians other than the Eastern Cherokees or the Cherokee Nation.”
It will be observed that in the original decree the language “ or to the legal representatives of such individuals ” is omitted in the modification directed by the mandate of the Supreme Court, and was therefore eliminated from the decree in the modification by this court; and even if the language in the original decree could be interpreted to. mean anything other than in loco parentis, it would be in conflict with the opinion of the court, where, at page 332, the court said: “ The decree will also provide for the payment of the fund to the parties per capita, the charge of distribution likewise to be a charge upon the fund.”
Such also was the opinion of the Attorney-General when the payments were made on the roll of 1851 (5 Op. Atty. Gen., 320, 329). The Attorney-General said: “Under these provisions my opinion is that the distribution is to be made per capita and equally among all the individuals residing east, and also all those residing west, other than the ‘ Old Settlers ’ found to be in existence at the time of the distribution — each being considered as entitled in his own right, and not by representation of another who is dead; and the pay *233 ment of these distributive shares should be made to the individual entitled, if of competent age — the shares of children to be paid to the heads of families to which they belong, whether those heads of families be male or female, father or mother, or persons standing in loco parentis.”
Furthermore, article 15 of the treaty of 1835 (7 Stat. L., 478, 485) provides:
“Article 15. It is expressly understood and agreed between the parties to this treaty that after deducting the amount which shall be actually expended for the payment for improvements, ferries, claims for spoliations, removal, subsistence, and debts, and claims upon the Cherokee Nation, and for the additional quantity of lands and goods for the poorer class of Cherokees and the several sums to be invested for the general national funds provided for in the several articles of this treaty, the balance, whatever the same may be, shall be equally divided between all the people belonging to the Cherokee Nation east, according to the census just completed, and such Cherokees as have removed west since June, 1833, who are entitled by the terms of their enrollment and removal to all the benefits resulting from the final treaty between the United States and the Cherokees east; they shall also be paid for their improvements, according to their approved value, before their removal, where fraud has not already been shown in their valuation.”
And so by article 9 of the treaty of 1846 (9 Stat. L., 871, 875) it is provided that “The United States agree to make a fair and just settlement of all moneys due to the Cherokees and subject to the per capita division under the treaty of 29th December, 1835, which said settlement shall exhibit all money properly expended under said treaty,” etc. Manifestly, by the terms of that article any settlement to be made with the Cherokees was to be subject to the per capita division under the treaty of 1835. So, in conformity with the resolution of the United States Senate, acting as umpire under article 2 of the supplemental treaty of 1836 (7 Stat. L., 488), declaring the amount due for the expenses of removal, Congress by the Indian appropriation act of September 30, 1850 (9 Stat. L., 544, 556), appropriated the amount so declared to be due, with this proviso: “ That in no case shall any money hereby appropriated be paid to any agent of said Indians, or to any other person or persons *234 than the Indian or Indians to whom it is due per capita.'1'’ The amount so appropriated, together with the larger amount appropriated therefor by the act of February 27, 1851 (9 Stat. L., 570, 572), all which, with interest from June 12, 1838, amounting to nearly $1,000,000, was, as found by the court in the original case (Finding XVI, 40 C. Cls., 281), .distributed to said Eastern Cherokees par capita in conformity with the treaties of 1835-36 and 1846, as the latter, act directed should be done, and also in conformity with the opinion of the Attorney-General heretofore cited, as directed by section 14 of the act of-August 18, 1856 (11 Stat. L., 92).
In communal property each member of the tribe is entitled to an equal share, or, as was observed by the court in the Whitmire case (30 C. Cls., 138, 159), the right to payment per capita is a recognition of an individual communal interest.
But we need not pursue this branch of the case, further, as it must be conceded that by the terms of the treaties, as well as the acts of Congress referred to, the distribution of the fund now in controversy must be to those Eastern Cherokees per capita, parties to the treaties of 1835-36 and 1846; and such was the purpose of the decree; and its language, when construed in conformity with the treaties and acts of Congress and opinion of this court in respect thereto, independently of the modification of the decree relating thereto, can have no other meaning, and certainly can not now, in view of the language of the Supreme Court to which reference has been made.
Therefore,, as the monejr arising from the decree of the court is to be distributed to those “ Eastern Cherokees as individuals, whether east or west of the Mississippi, parties to the treaties of 1835-36 and 1846, and exclusive of the Old Settlers,” the question is what Eastern Cherokees were parties thereto ?
Those who separated themselves from the tribe prior to the treaty of 1835 ceased to be members of the tribe under Cherokee law, and they can not now come in and claim enrollment by reason of being descendants of some remote *235 ancestor who was enrolled. The enrollment of a remote ancestor will not operate to preserve the tribal rights of those who-separated themselves from the tribe. They must show that they were parties to the treaties of 1835-36 and 1846. That is a condition precedent to their right to share in the distribution of the fund; and by the terms of article 15 of the treaty of 1835, “the balance, whatever the same may be, shall be equally divided between all the people belonging to the Cherokee Nation east according to the census just completed,” while article 9 of the treaty of 1846 in express terms provides that “ the- United States agree to make a fair and just settlement of all money due to the Cherokees and subject to the per capita division under the treaty of 29th December, 1835.”
Thus there would appear to be no room for controversy but that those on the roll of 1835 and their descendants who have maintained their tribal relations are entitled to the per capita distribution of the fund; but it is claimed that the roll of 1835 was incomplete, as only the number of children of those enrolled was given; and so when the time came to distribute the money appropriated by the acts of Congress hereinbefore referred to it became necessary and the Secretary of the Interior was thereby authorized to make a new roll to ascertain who were entitled to the per capita distribution of the money so appropriated.
As a matter of history, which in the main has been incorporated in various public documents, let us examine the basis of the various rolls when made, and the number of Eastern Cherokees heretofore and now enrolled east and west of the Mississippi Elver, together with the causes of both the increase and decrease in numbers at the respective dates of enrollment.
The heads of families and their children who were on the census roll of 1835, referred to in- article 15 of the treaty as “just completed,” numbered 16,542, as shown by the report (Bureau of Ethnology, vol. 5, p. 289). But in their forced removal west in 1838-39, by reason of the hardships of the journey, change of food and climate, and from other causes, over 1,600 died on the way, while many more died soon after *236 their arrival in the Indian Territory. “Altogether it is asserted, probably with reason, that over 4,000 died as a direct result of the removal.” (See Report Bureau of Ethnology, 1897-98, pt. 1, p. 133.)-
After their arrival in the Indian Territory, their number being greater than that of the Western Cherokees then in control there of tribal matters, a fierce conflict arose between them as to which faction should rule the tribe. The conflict was fierce, resulting in many deaths and murders, and continued -until they became reunited under the treaty of 1846. (See Report Bureau of Ethnology, vol. 5, pp. 292, 294, and 303-305.)
At the time of this deportation westward in 1838 there remained east probably something over 1,000 Cherokees, though this is an estimate, as their number is not definitely known. But thirteen years later, when the Chapman roll of 1851 was made of the-Eastern Cherokees residing east — that is, in various counties in North Carolina, Tennessee, Alabama, Georgia, Kentucky, and some in the District of Columbia — they numbered 2,134.
As shown by the ethnological report for 1897-98, part 1, page 167, the Chapman roll of 1851 was based upon the census roll of 1835 and the Mullay roll of 1848 and the later census roll of Siler, and was carefully revised, showing the name, age, and sex of each individual enrolled and their relationship to the heads of the group. Neither roll, it is said, varied greatly from the Mullay roll of 1848, which at first contained only 1,513 names, to which were subsequently added more than 600, making a total 2,113. But, as said in the report referred to, “ it is not the only time a per capita payment has resulted in a sudden increase of the census population.”
Notwithstanding the care taken in the preparation of this roll, complaint was made that many Indians who were entitled to be enrolled had been omitted. This led to the act of July 31, 1854, section 8 (10 Stat. L., 333), which was amended by the acts of March 3, 1855, section 4 (10 Stat. L., 700), and August 18, 1856, section 14 (11 Stat. L., 92), Avhereby the Secretary and afterwards the Commissioner of *237 Indian Affairs were directed to enroll for payment per capita all Cherokee Indians residing east of the Mississippi who had been omitted from the census taken by said Agent Siler from any cause whatever; and as a result a large number of families filed claims, including some of those now claiming, but only 88 names were added to the roll, all other claims being rejected. Thus the roll of Eastern Cherokees in the East stood 2,222.
The other roll of Eastern Cherokees residing west of the Mississippi, known as the Drennan roll of 1851, and which with the Chapman roll comprise the pay rolls upon which the distribution of the fund appropriated, as aforesaid, was made, contained the names of 14,094 persons, or, by reason of the excessive number of deaths before referred to, more than 2,400 persons less than were taken west in 1838.
From 1851 (Report of Bureau of Ethnology for 1897-98, pt. 1, p. lpl) down to 1900 there was, through the encouragement given thereto by the Cherokee Nation, quite a movement from time to time of Eastern Cherokees in the East to the Indian Territory, thus diminishing the number east and correspondingly increasing the number west. In addition to this, as shown by the same report at pages 168-172, a considerable number of Cherokees in the East were engaged in the military service, and a large number were killed. Also by the same report (pp. 171, 179) it is shown that in 1876 there was a virulent epidemic of smallpox among them and a large number died, and later an epidemic in North Carolina of grip spread through the bands located there and many deaths resulted. But this is not all, for it appears from the same report (pp. 148-150) that the Cherokees in the West were reduced in a marked degree as a result of the civil war. They were not only harassed by both armies engaged in that conflict, but Avere divided among themselves. As a result it is stated that “ after five years of desolation the Cherokees (in the West) emerged from the Avar with their numbers reduced from 21,000 to 14,000 and their whole country in ashes.” The total number, however, shown by the census roll in 1867, as appears by footnote 2 of the same report, at page 150, was only 13,566, and this number, re *238 duced as it was, included the Old Settlers, thus showing that in 1867 the total number of Cherokees in the West, including both the Eastern and the Western Cherokees, was less than the total number of Eastern Cherokees enrolled in the West in 1851.
Now, let us see how this number thirty-five years later corresponds with the number of Cherokees enrolled for the allotment of lands in the Indian Territory by the Commission to the Five Civilized Tribes, known as the “Dawes Commission.” This commission enrolled all Cherokees, by blood, including both the Old Settlers and the Eastern Cherokees residing west September 1, 1902, and their corrected roll shows only about 32,500 names.
Thereafter, pursuant to acts of Congress extending the time within which to make the roll to March 4, 1906, there were added all Cherokees, by blood, born between September 1, 1902, and March 4, 1906, numbering 4,991, thus making the total number of all the Cherokees by blood enrolled for allotment about 37,500, which includes the Old Settlers arid all the Eastern Cherokees residing with them in the West. (Final rolls of citizens and freedmen of Five Civilized Tribes hv Indian Territory.) But from this number there should be deducted those enrolled as of September 1, 1902, who, between that date and March 4, 1906, had died, which, according to the mortality tables, would be about 4,000, leaving a total enrollment of Cherokees by blood in the West as of the date of March 4, 1906, of about 33,500. At the time of the making of the rolls in 1851 there were of Eastern or Emigrant Cherokees residing in the West 14,094, and of Old Settlers or Western Cherokees 3,273, or a total of 17,365. Thus, in 1851 the roll of Old Settlers was about 19 per cent of the total number of Cherokees in the West; and assuming that the percentage of Old Settlers was about the same in 1906, there should be deducted from the 33,500 enrolled Cherokees by blood in the West, 6,270, leaving about 26,730 Eastern Cherokees by blood residing in the West March 4, 1906.
The roll prepared by the special commissioner of those living on May 28,'1906 (filed May 28, 1909), since supple *239 mented by other reports making corrections therein and adding thereto other names, show in all now recommended for enrollment 27,381 Eastern Cherokees in the West, which number is slightly in excess of the 26,730 estimated as enrolled by the Dawes Commission March 4,. 1906. The excess may arise from births in the interim, while, on the other hand, that number ma3r have been diminished somewhat by those of more or less mixed blood who affiliated with other tribes or otherwise severed their connection with the Cherokees.
As before stated, the Chapman roll of 1851 contained the names of 2,134 Eastern Cherokees residing in the East, supplemented bjr the 88 names added by the Secretary of the Interior pursuant to the acts of Congress referred to, making in all 2,222 Cherokees in the East, while the special commissioner has enrolled 3,437, which increase, taking into account reductions from disease, emigration west, and other causes, as before stated, since 1851, would appear reasonable. Hence, the total number of Eastern Cherokees, both east and west of the Mississippi, recommended by the special commissioner f(or enrollment, is 27,381 west and 3,437 east of the Mississippi, making in all recommended for enrollment 30,818.
In 1882 the agency was reestablished and Agent Hester was authorized to take a census of the Cherokees east of the Mississippi, which he did, and in 1884 he submitted a roll containing the names of 2,956 individuals, of which 1,881 were enrolled from North Carolina, 758 from Georgia, 213 from Tennessee, 71 from Alabama, and 33 from various other places, and, though that roll was approved and certified by the Eastern Cherokee Council, a large number refused to recognize it, claiming that a large number so enrolled had no Cherokee blood. (Keport Bureau of Ethnology, 1897-98, pt. 1, p. 176.) This roll, the special commissioner informs us, was of material assistance to him in verifying those on the rolls of 1851.
Hence, with the rolls referred to as a,basis for the roll of 1851 and its verification by the Hester roll of 1884, is it not conclusive, in the absence of fraud, that those Eastern Chero *240 kees on the rolls of 1851 who shared in the per capita distribution of a like fund with that now to be distributed are entitled to share ? And i'f so, shall the rolls of 1851 in effect be extended and enlarged by adding to the present roll those who were rejected or for other reasons were not enrolled either in 1835 or 1851 ? To do so would be fraught with far more serious consequences to those on the rolls of 1851 and their descendants than to those who have been rejected because they or their immediate living ancestors were not on the roll of 1835. Certainly the amount of money to be distributed was an incentive for all .those entitled to apply for enrollment, and it appears that many of those who did apply were rejected.
For these reasons the enrolling officer in making up the present roll was directed by the Secretary of the Interior, while under his supervision and control, to accept as a basis the rolls of 1851. It was in effect a revision and extension of the roll of 1835, and showed not only those who were parties to the treaties of 1835-36 and 1846, but their descendants.
The instructions to the enrolling officer to enroll “ all such Eastern Cherokee Indians, by blood, living on May 28, 1906, as shall establish the fact that they were members of the Eastern Cherokee tribe of Indians at the date of the treaty of 1835-36 and 1846, or are descendants of such persons,” were not intended to enlarge the modified decree directed by the Supreme Court, but was to effectuate the same bjr indicating the method by which the enrolling officer was to ascertain who were parties to said treaties. This he could do only by the census roll of 1835 and the roll of 1851 and subsequent rolls verifying those rolls. Hence, the rolls of 1851 not only contain the names of those Eastern Cherokees, by blood, then living Avho were patties to the treaties of 1835-36 and 1846, but contain the names of the descendants of those who in the meantime had died. Therefore, accepting the rolls of 1851, prepared by the Secretary of the Interior, and by adding thereto the descendants born between that date and the date of the modified final decree May 28, 1906, and striking therefrom the names of those who have since *241 died or affiliated with other tribes, we have a roll based not only on the best evidence but the only reliable evidence obtainable at this date.
This course is not unusual, for in the Whitmire ease (30 C. Cls., 180, 184, 186) the court accepted the roll of freedmen known as the corrected “ Wallace roll ” which was prepared by the Secretary of the Interior, or under his direction, pursuant to statutes directing him to make the per capita distribution of the money therein appropriated (25 Stat. L., 609 and 994). The preparation of a roll in that case occupied two years. The Cherokee Nation, against whom the appropriation was by the terms of the act charged, though interested in the number of freedmen to be enrolled, refused to take part, but their refusal, the court held, was “ as effective as if it had actually taken part and voluntarily been represented;” and though the Cherokee Nation contended that the roll contained many more names than there were freedmen, still the court accepted it as the best evidence of the number entitled to share in the distribution; and though that roll was less than 20 years old, the court in commenting thereon said: “ It may be that the Wallace roll was extended beyond the true number of the persons entitled to be placed thereon; but if it was, the fault was with the Cherokee Nation, who could have contested every name that was placed upon it, and who had the means of exposing every error that may have existed; and the United States spared no pains to make the roll a true exhibit in the case. The court believes that the difficulties in arriving at a true result which existed then will be greatly multiplied now.”
And so in the present case the special commissioner, by reason of his conceded ability as a lawyer and his high character as a man, coupled with his experience in the enrollment of Indians under the directions both of this court and the Interior Department, was thereby specially fitted for the work, and with a large corps of efficient assistants examining and comparing rolls, visiting various localities where the Indians reside, and taking testimony for over three years, he submits for approval a roll containing the names of nearly 31,000 individual Indians whom he recom *242 mends as entitled to share. It may be there are others who ought to be enrolled, and that some are on the roll who ought not to be; but it is a significant fact that only three or four exceptions have been filed against the individual Indians recommended for enrollment. On the other hand, of the more than 50,000 who applied that are now recommended for rejection less than one-half have filed exceptions, and'many of those have been abandoned or are not now insisted upon. None of them claim that they or their immediate ancestors were enrolled either in 1835 or 1851, except in a few instances, and as to those the special commissioner, by supplemental reports, recommends their enrollment unless they have since affiliated with other tribes, in which case they are not entitled under the decree to be enrolled.
Is it not a startling fact that the number — over 80,000— who applied as Eastern Cherokees for enrollment exceed the number of Indians by blood enrolled by the Dawes Commission in the Five Civilized Tribes? The rolls of that commission show that the total enrollment of Indians by blood in the Five Civilized Tribes up to 1906 was about 18,000, making no deductions for those who died between 1902, when the first roll was made, and 1906, when the second roll was made, adding children born between those dates. (See Final Rolls of Citizens and Freedmen of Five Civilized Tribes in Indian Territory.)
This of itself shows the care with which the special commissioner and his assistants had to conduct the investigation to learn who were entitled to be enrolled to share in the fund to be distributed. Especially will this seem startling when it is a well-known historical fact that the number of Indians of all tribes residing in the United States to-day, exclusive of Alaska, varies little from what it was over a hundred years ago.
The Commissioner of Indian Affairs, in his annual report for 1900,. page 48, gives estimates of the population of all Indians in the United States from 1759 to 1900; and while there is much uncertainty about the number of Indians in the country prior to 1820, no reliable census having been taken up to that time, the commissioner in said report for 1900 refers *243 to a report made by Morse on Indian affairs in 1820, in which the number is given as 471,036, being the greatest number shown up to that time or since. In 1834 — the year before the treaty of 1835 — as shown by the report of the Secretary of "War, then having charge of Indian affairs, referred to by said commissioner in said report of 1900, there were 312,610. The United States census report for 1890 shows 248,253, while the Commissioner of Indian Affairs in his report for 1909, page 143, gives the total population of Indians in the United States, exclusive of Alaska, at 300,545, so that it is safe to say that the total number of Indians in the United States to-day is no greater, if not less, than it was in 1835.
As the special commissioner was somewhat criticised by counsel on the argument for not having, as they claimed, advised applicants of their rights and of the course they should pursue to establish the same, we deem it but fair to him and of sufficient public interest to refer to his special report — as an appendix to this opinion — made at the request of the court showing the care taken by him and his assistants in the preparation of the roll. The report will speak for itself.
The main contention of those rejected and who have filed exceptions is that they are Cherokees by blood whose ancestors were living within the Cherokee domain at the time of the treaty of 1835-36. But the answer to this contention is that by the express provision of article 15 of the treaty of 1835 the money is to “be equally divided between all the people belonging to the Cherokee Nation east according to the census just completed;” and conceding, as contended, that said roll is incomplete because the number of children only is given, and that some who were entitled to be enrolled were omitted, still when the rolls of 1851 were made they extended and revised the roll of 1835 so as to include the names of all those enrolled in 1835, or their descendants, and presumably all those entitled to enrollment who were omitted from the roll of 1835, or their descendants. Hence in any view of the case the rolls of 1835 and 1851 must be accepted as the correct rolls of those and their descendants now entitled to enrollment.
These views are in harmony also with those acts of Congress accepting the latest annuity rolls as a basis of distribu *244 tion; and the present Congress by joint resolution (Public, No. 11) approved January 20, 1910, in directing certain moneys to be paid to members of the Winnebago tribe in Nebraska and Wisconsin, directed payment to be made “ to the members of the tribe whose names appear on the latest annuity pay rolls in the office of Indian Affairs, with, such changes as may have been caused by subsequent births and deaths.”
In the preparation of such rolls it has been found absolutely necessary not only by the courts and the executive departments, but by Congress, as shown by their legislation, to adopt some known roll as a basis; and in the present case the lapse of time since the treaties of 1885 and 1846 makes it all the more imperative that the rolls of 1835 and 1851 should be accepted, especially since the roll of 1851 was the one upon which a like fund was distributed to those Eastern Cherokees who were parties to the treaties of 1885-36 and 1846. In other words, the present fund to be distributed is the balance due them for the expenses of their removal from their eastern to their western home in 1838; and if the present fund had then been available it would have been distributed per capita to those on the rolls of 1851.
It is conceded that the rolls of 1851 should, in the absence of fraud, be accepted as conclusive as to the rights of those then enrolled and their descendants to share in the distribution of the present fund; and the court is of the opinion that after this lapse of time the rolls of 1835 and 1851 should be equally conclusive against "the right of those now seeking-enrollment who were then rejected or for other reasons were not enrolled. The court can see no other way to effectuate justice in the execution of its decree in the distribution of the fund.
The rolls of 1851 were made when matters were fresh in the minds of the people, and, too, when a fund of sufficient magnitude was to be divided not only to encourage enrollment, but to cause the applicants to guard the rights of each other. No such condition now exists. The heads of families enrolled in 1835 now living would be, approximately, 90 years .of age, and doubtless few are living, while those who were *245 enrolled as infants in 1851 are now at least 60 years of age, and doubtless most of them have passed away.
Those recommended for rejection and who have filed exceptions are located largely in the East, or their ancestors were living east in 1851, though very few reside with the Cherokees in North Carolina, and still fewer with the Cherokees in Oklahoma, where the great bodies of Cherokees reside.
Furthermore, the roll of 1851, as before stated, was supplemented by the complete roll of 1883-84 of Eastern Cherokees then residing in the East, made by Agent Hester under the direction of the Secretary of the Interior. This roll refers to the ancestors whose names appear on the rolls of 1851, and was, the commissioner informs us, of great aid to him in identifying those living in the East, from which section the great bulk of the exceptions come.
All this shows the importance of adhering to the rolls of 1835 and 1851. Certain it is that if we should abandon these rolls as the basis of determining the rights of those entitled, as well as of those not entitled, to share in the fund to be distributed, we would be at sea without anchorage, where, at this distance from 1835 and 1851, we would necessarily encounter such doubt and uncertainty as would lead us to the conclusion that oral testimony, whether taken in the form of ex parte affidavits or by the special commissioner or others in the field, would not be of sufficient credibility to convince the court that the rolls of 1835 and 1851 were incorrect or of the right of those claiming to be enrolled under such testimony. For these reasons all motions asking the court to instruct the special commissioner or others to take further testimony in the field are overruled.
When the special commissioner made his report, May 28, 1909, submitting the roll prepared by him for approval, those objecting thereto were, under the order of June 10, 1909, given until August 31 following within which to file their exceptions, and later the time was extended to November 15, 1909. Those so rejected were notified by circular letter under date of the order, and they were advised as to the contents of the order and the requirements in filing their exceptions. That is to say, those excepting to the report of *246 the special commissioner were directed by the order to state in writing the grounds of their exceptions, giving both the Indian and the English name of the ancestor through whom they claimed, and their ages, living in 1835 or 1851, supporting the same by an affidavit of some persons having-knowledge of the facts.
These exceptions and the affidavits filed in support thereof as abstracted by the respective counsel have been carefully considered, first by the special commissioner, thereby giving him an opportunity to correct any mistakes he may have made, -and whether, in his opinion, further investigation in the field would probably lead to different- results. He has submitted supplemental reports showing corrections in his original report arising from duplications in names, omission of minor children by parents in their applications, and some few arising from information obtained from the exceptions filed, and in addition he recommends the names of a few for enrollment who had failed to file their applications within the time prescribed; and as thus corrected the special commissioner submits for approval the corrected roll of 30,818 names.
The court has endeavored to carefully consider and weigh the argument of counsel as well as their briefs and their abstracts of evidence in particular cases; but believing, as wq do, that the corrected rolls submitted by the special commissioner for approval contain the names of all Cherokees by blood, “ east and west of the Mississippi, parties to the treaties of 1835-36 and 1846 and their descendants,” who are entitled to share in the distribution of the fund arising from the decree of the court, we must hold that oral testimony can not now be considered to vary the rolls thus made in 1835 or 1851.
The court therefore reaffirms its rulings made October 28, 1909, holding — ■
That those who claim through ancestors who were not enrolled with the Eastern Cherokees either in 1835 or in 1851 and were not living within the Cherokee domain in 1835 are not entitled to be enrolled, though of Cherokee descent. Nor are those claiming through remote ancestors, whose imme- *247 cliate ancestors were then living and of age and the heads of families in 1835, but who were not living within the Cherokee domain, and were not enrolled either in 1835 or 1851, now entitled to be enrolled as descendants of some remote ancestor who was enrolled in 1835, as only those who were members of the tribe at the date of the treaty of 1835-36, or are descendants of such persons, are entitled to be enrolled. Nor are those entitled to enrollment who claim through ancestors whose right to enrollment in 1851 was considered and rejected, as in the absence of fraud such rejection, the court held, must now be considered as final. Nor are those who were slaves, or trace their Cherokee descent through an ancestor who was born a slave, now entitled to be enrolled. Nor are those claiming as descendants of ancestors who were parties to either or both the treaties of 1835-36 and 1846 who have affiliated or been enrolled with other tribes now entitled to be enrolled.
And we will add that those whose immediate ancestors were of age and heads of families living within the Cherokee domain in 1835 who were not enrolled either in 1835 or 1851 and who now claim as descendants of remote ancestors, claimed to have been of Cherokee blood, are not for that reason entitled to be enrolled; nor would the enrollment of remote ancestors operate to preserve the rights of those whose immediate ancestors were entitled but neglected to be enrolled. But whether those now claiming as descendants of immediate or remote Cherokee ancestors by blood, living within the Cherokee domain in 1835, or whether such ancestors were or were not then enrolled, is, for the purpose of the present roll, immaterial, as all such ancestors or their descendants then entitled thereto were presumably enrolledin 1851; and since the rolls of 1851 are the ones upon which the like fund as that now to be distributed was paid, we must hold, in the absence of fraud (which is not charged or imputed), that oral evidence, however taken at this late day, would not be either of sufficient credibility or probative force to overcome the presumption of their enrollment in 1851.
*248 For the reasons given all exceptions filed basing their right to enrollment on any of the grounds hereinbefore referred to are overruled.
The supplemental reports of the special commissioner recommending that some names be stricken from the original roll, correcting the names of others thereon, and adding additional names thereto, are allowed, and the additional names thus recommended for enrollment the court now orders to be printed as a supplement to the original roll; and when so printed the original roll, as thus corrected, together with the supplemental roll, are directed to be submitted to the court as the corrected and final roll for approval.
Howry, J., not having heard the case argued, took no part in its decision.
APPENDIX.
SPECIAL REPORT.

To the honorable the chief justice and justices of the Court of Claims:

In response to the request of the court I have the honor to report that in carrying out my duties as special agent of the Indian Office and as special commissioner of this court for the enrollment of the Eastern Cherokees I took the measures set forth below to give notice to all person in interest, and to ascertain whether the claimants were entitled to participate in the fund arising from the judgment of the court of May 28, 1906.
Immediately upon my appointment as special agent of the office of Indian Affairs I prepared a notice in the name of the commissioner, which bore date of August 20, 1906, to all Eastern Cherokees to file their applications for participation in the fund with the Commissioner of Indian Affairs by January 31,1907. This advertisement set forth that the rolls of 1851, upon which the per capita payment to the Eastern Cherokees was made, would be accepted as a basis and the fund would be distributed to the individuals named in said rolls of 1851 or to their legal representatives.
*249 This notice was published in more than twenty papers, whose circulation covered the territory of the Cherokees, both in the east and in the west. At the same time large posters were printed containing the same notice and were mailed to all the postmasters in the Cherokee territory east and west, with the request that the same be posted in a conspicuous place. Also, these posters were mailed to all the Indian agents and superintendents of Indian schools throughout the United States.
Learning that some difficulty was being experienced in the filling out of the applicantion blanks and that some uncertainty existed as to just what was expected of the claimants, I obtained permission for Mr. J. E. Tyler, my assistant, and myself to proceed to the Cherokee country early in October, 1906, to hold meetings with the Indians and to fully explain to them what was required. Notice of these meetings was given in the local newspapers and they were well attended. Interpreters were used and the whole matter was fully stated. During this trip the special agents met a large number of Indians personally and whenever possible gave the fullest information.
During this trip it came to my attention that some of the full-blood Indians were holding back and not making applications, and I prepared a notice in simple language, containing the substance of the original notice and had the same translated into the Cherokee language and printed in Cherokee type, under date of October 26, 1906. These circulars, or posters, were distributed throughout the full-blood country by the United States Indian agent at the Union Agency, Muskogee, Okla., and by the superintendent of the Indian school at.Cherokee, N. C.
Having become satisfied that all those entitled would not file their applications by January 31, 1907, I recommended that the time for filing such applications be extended to March 31, 1907, which was done, and notices of this extension were published in the same manner as the original notices.
When, in February, 1907, the Secretary of the Interior referred the question of whether the payment should be *250 made per stirpes or per capita to the Court of Claims, the court entered an order giving notice of the questions raised, which order was published in the following papers:
The Bartlesville Examiner-Bartlesville, Okla.
The Vinita Leader-‘_Vinita, Okla.
The Fort Gibson Post_Fort Gibson, Okla.
The Tahleqnah Arrow_Tahlequah, Okla.
The Muskogee Phoenix_Muskogee, Okla.
The Claremore Progress_Claremore, Okla.
The Sallisaw News_Sallisaw, Okla.
The Fort Smith Elevator_*._Fort Smith. Ark.
The Holly Springs Reporter_Holly Springs, Miss.
The Cherokee Scout-Murphy, N. C.
The Waynesville Courier_Waynesville, N. C.
The Asheville Citizen_Asheville, N. C.
The Abingdon Virginian-Abingdon, Va.
The Marion Democrat_Marion, Va.
The Ducktown Gazette_Ducktown, Tenn.
The Cleveland Banner_Cleveland, Tenn.
The Chattanooga Times_•_Chattanooga, Tenn.
The Athens Post_Athens, Tenn.
The Borne Tribune-1_Rome, Ga.
The Dalton Argus_Dalton, Ga.
The Canton Cherokee Advance_Canton, Ga.
Upon the entry of the order of April 29, 1907, I prepared notices as follows:
“ EASTERN CHEROKEES-NOTICE.
“ On April 29, 1909, the Court of Claims entered an order in the case of the Eastern Cherokees against the United States, directing that the fund arising from the decree of the court of May 28, 1906, in favor of the Eastern Cherokees be distributed to all Eastern Cherokee Indians, by blood, living on May 28, 1906, who shall establish the fact that they were members of the Eastern Cherokee tribe of Indians at the date of the treaty of 1835-36 and 1846, or are descendants of such persons, and who can further establish the fact that they have not been affiliated with any tribe of Indians other than the Eastern Cherokees or the Cherokee Nation;, provided, further, that said persons, pursuant to the notices of the Commissioner of Indian Affairs, bearing dates of August 20, 1906, and February 1, 1907, have filed applications for a share of such fund with the Commissioner of Indian Affairs, or shall file such applications with the special com *251 missioner of the Court of Claims on or before the 31st day of August, 1907.
“ Therefore all Eastern Cherokees who are entitled under the provisions of said order, as above set forth, who have not already filed applications before the Commissioner of Indian Affairs, should make application to Guión Miller, special commissioner of the Court of Claims, 601 Ouray Building, Washington, D. C.
“Applications for minors and persons of unsound mind should be executed by their parents or persons having their care and custody. Applications for persons who have died since May 28, 1906, should be filed by their children or legal representatives.
“All applications must be made upon the blank forms prescribed, which may be obtained free of charge by application to the special commissioner. Applications not on the prescribed forms will not be considered.
“ Claimants who have already filed applications with the Commissioner of Indian Affairs need not file applications unless they have minor children for whom applications have not been filed. All applications must be filed by August 31, 1907.
“ Guión Miller,
“Special Commissioner of the Court of Claims,
“601 Ouray Building, Washington, D. C
These notices were published for two months in the 21 different papers named above.
At the same time large posters were printed and distributed as in the case of the original notice, and a simplified notice was translated into Cherokee and printed in Cherokee type and distributed through the United States Indian agent at the Union Agency of Muskogee, Okla., and by the superintendent of the Indian school, at Cherokee, N. C.
Application blanks were also prepared and a supplemental application blank was printed and mailed to about 20,000 claimants who had filed original applications with the Commissioner of Indian Affairs, and a circular letter was inclosed in which their attention was called to the provisions of the order of April 29,1907, and they were notified to fill out the supplemental application in case they had minor children who would be entitled to share under that order.
*252 At the same time an abstract of a decree of the court of May 28,1906, and of the order of April 29,1907, was printed, which fully set forth the provisions of the order of April 29, 1907. This abstract was distributed to all attorneys and others making inquiry as to the status of the enrollment, and thousands of these abstracts have been distributed.
The blanks upon which applications were to be made required the claimants to state fully their English and Indian names, residence, age, place of birth, the name of husband or wife, if any, and to what tribe of Indians he or she belonged, and the names of the children. It further required the English and Indian names of their father and mother, where each was born, and Avhere residing in 1851, if living at that time, and the date of death of the father and mother, and whether either of them had ever been enrolled as Indians for annuities or other benefits; and if so, with what tribe. The same information was required as to the grandparents of the claimants. Also, the claimants were to furnish the names of their brothers and sisters, with their ages and residences. Also, the names and residences, where possible, of all their uncles and aunts. Each claimant was further called upon to state whether he had been enrolled as an Indian; and if so, when, where, and with what tribe. In conclusion, the claimant was called upon to give the full English and Indian names, if possible, of his parents and grandparents back to 1835, and was requested to give any additional facts which would assist in proving his claim. This application was required to be under oath and to be supported by the affidavit of two witnesses who were well acquainted with the applicant, stating how long they had been thus acquainted, and that they believed the statements in the application to be true.
These applications were collected into family groups and were carefully examined, and an earnest effort was made to determine whether the claimants or any of their ancestors had been enrolled with the Eastern Cherokees. Where the preliminary examination showed that the application was incomplete or insufficient to establish the right of the claimant, letters were addressed to the older members of the group calling for full information, in which questions of the fol *253 lowing nature were asked, as the necessities of eacb case required:
Do you claim your Cherokee Indian blood through your father or your mother?
Give the date of death of the parent through whom you claim and state how old he or she was at that time. Was he or she recognized as a white person, Indian, or negro in the communities in which he or she resided?
Give the date of the birth of the parent through whom you claim. Were your grandparents on that side living with the white people or with the Indians ?
Give the name and place of birth of the grandparent through whom you claim. ' State whether he or she lived with the Indians or white people, and whether he or she was recognized as a white person, an Indian, or a negro in the community in which he or she lived.
Did the parent and grandparent through whom you claim ever receive any money or land from the Government on account of having Indian blood?
Were any of your ancestors ever enrolled as Indians? If so, state where and with what tribe.
Did the parent through whom you claim, or any of your ancestors, ever take part in any of the Cherokee proceedings? Did they vote with the white people?
Where were the parent and grandparent through whom you claim living at the time the Indians were moved West? Did your parents or grandparents go with them? If not, state why. • .
Please indicate clearly and fully your reasons for thinking that you are a Cherokee Indian by blood.
Did you ever hear of the treaty the Government made with the Indians in 1835? If so, state what you know about it.
"Where were you or your parents living in 1882 ?
If your parents or grandparents on the side through which you claim were enrolled in 1851, please indicate carefully the names under which you think they were so enrolled, as the names given in your application do not appear upon the rolls taken at that time.
*254 State where your parents were born and where they, or your grandparents on the side through which you claim, resided in 1835, and when they moved West.
When the information obtained from the applications, the rolls, and the correspondence was insufficient to reach a definite conclusion the applications were marked for field examination, and wherever such claimants resided within the reasonable limits of a field examination they were notified to appear before me, or one of my assistants, and bring with them such witnesses as they might desire to establish their claim. Whenever such claimants presented themselves with their witnesses for examination, they were given full and careful examination and every effort made to elicit all the facts that would throw any light upon the claim. With the information thus collected from various sections ’ these applications were given careful consideration in connection with the testimony and the rolls, and where a definite conclusion could not then be reached they were marked for a second field examination, which was conducted in the same manner as the first.
Whenever attorneys for the claimants appeared before any of the examiners in the field, they were uniformly afforded every opportunity to examine witnesses and produce additional proof if they so desired.
Respectfully submitted.
GuioN Miller,

Special Commissioner.

FEBRUARY 4, 1910.