## CHEROKEE INTERMARRIAGE CASES.

### RED BIRD *et al.*, CITIZENS OF THE CHEROKEE NATION BY BLOOD, *v.* UNITED STATES.

### CHEROKEE NATION *v.* UNITED STATES.

### FITE *et al.*, INTERMARRIED WHITE PERSONS, CLAIMING TO BE ENTITLED TO CITIZENSHIP IN THE CHEROKEE NATION, *v.* UNITED STATES.

### PERSONS CLAIMING RIGHTS IN THE CHEROKEE NATION BY INTERMARRIAGE *v.* UNITED STATES.

#### APPEALS FROM THE COURT OF CLAIMS.

Nos. 125, 126, 127 and 128.   Argued February 19, 20, 1906.—Decided November 5, 1906.

Judgment of the Court·of Claims affirmed to effect that all those white persons who married Cherokee Indians by blood subsequently to the enactment of the Cherokee law, which became effective November 1, 1875, acquired no rights of soil or interest in the lands and vested funds of the Nation as citizens; and that those white persons who married Cherokee citizens by blood prior to said date did acquire rights as citizens in the lands belonging to the Nation, and held and owned as national lands, except such of them as lost their rights as Cherokee citizens by abandoning their Cherokee wives or by marrying other white or non-tribal men or women having no rights of citizenship by blood in said Cherokee Nation.

The rule that the language of a statute is to be interpreted in the light of the particular matter in hand and the object sought to be accomplished as manifested by other parts of the act, and that the words used may be qualified by their surroundings and connections, applied to the construction of the acts of Congress relating to citizenship in, and distribution of tribal property of the Cherokee Nation.

It is a settled rule of construction that as between the whites and the Indians the laws are to be construed most favorably to the latter.

40 C. Cl. 411, affirmed.

THE subject matter of this suit consists of 4,420,406 acres of land in the Cherokee country about to be allotted among the Cherokee people entitled to participate in the distribution of the common property of the Cherokee Nation. The case was transmitted to the Court of Claims by the Secretary of the Interior on the twenty-fourth of February, 1903, the nature of the controversy being thus stated:

"A controversy has arisen as to the rights of white persons intermarried with Cherokee citizens, and a protest has been filed with this Department on behalf of a large number of citizens of the Cherokee Nation by blood against the enrollment of intermarried persons, 'so as to recognize their right to participate in the distribution of any of the common property of the Cherokee Nation of whatever kind or character.' It is asserted, on the one hand, that the Cherokee laws have never recognized the right of 'intermarried citizens' to share in the distribution of the property of the Nation, and, on the other hand, that the Cherokee laws as well as the laws of Congress recognize those persons who have been married to Cherokee citizens in accordance with the laws of the Cherokee Nation relating to marriage as full citizens of such Nation entitled to share equally with full blooded citizens in the property of the tribe."

Thereafter, Congress, by the act of March 3, 1905 (33 Stat. 1048, 1071, c. 1479), provided as follows:

"That in the case entitled 'In the matter of enrollment of persons claiming rights in the Cherokee Nation by intermarriage against the United States, departmental, numbered seventy-six,' now pending in the Court of Claims, the said court is hereby authorized and empowered to render final judgment in said case, and either party feeling itself aggrieved by said judgment shall have the right of appeal to the Supreme Court of the United States within thirty days from the filing of said judgment in the Court of Claims. And the said Supreme Court of the United States shall advance said case on its calendar for early hearing."

The Court of Claims filed its opinion May 15, 1905, and on May 18 findings of fact and conclusions of law, and on that day entered its decree as follows (p. 446):

"This case having been transmitted to this court by the Secretary of the Interior by letter dated February 24, 1903, for the findings and opinion of the court in accordance with the provisions of section 2 of the act of Congress of March 3, 1883, entitled 'An act to afford assistance and relief to Congress and the executive departments in the investigation of claims and demands against the Government' (22 Stat. 485), and Congress, by the act of March 3, 1905, entitled 'An act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June 30, 1906, and for other purposes,' having made the following enactment:

" 'That in the case entitled "In the matter of enrollment of persons claiming rights in the Cherokee Nation by intermarriage against the United States, departmental, numbered seventy-six," now pending in the Court of Claims, the said court is hereby authorized and empowered to render final judgment in said case, and either party feeling itself aggrieved by said judgment shall have the right of appeal to the Supreme Court of the United States within thirty days from the filing of said judgment in the Court of Claims. And the said Supreme Court of the United States shall advance said case on its calendar for early hearing;'

"And the cause coming on to be heard upon the petition answers, agreed facts, proofs, and arguments submitted by the attorneys of the parties to the cause, respectively, and the court having heard and fully considered the same;

"And it appearing to the court that all those white persons who married Cherokee Indians by blood subsequently to the enactment of the Cherokee law, which became effective November 1, 1875, and which declared that such persons by intermarriage acquired no rights of soil or interest in the

vested funds of the Nation, had due notice of the limitations set upon their rights and privileges as citizens; and that those white persons who married Cherokee citizens by blood prior to said date acquired rights as citizens in the lands belonging to the Nation, and held and owned as national lands, except such of these intermarried persons as lost their rights as Cherokee citizens by abandoning their Cherokee wives or by marrying other white or non-tribal men or women having no rights of citizenship by blood in said Cherokee Nation:

"It is by the court ordered, adjudged, and decreed that such white persons residing in the Cherokee Nation as became Cherokee citizens under Cherokee laws by intermarriage with Cherokees by blood prior to the first day of November, 1875, are equally interested in and have equal *per capita* rights with Cherokee Indians by blood in the lands constituting the public domain of the Cherokee Nation, and are entitled to be enrolled for that purpose, but such intermarried whites acquired no rights and have no interest or share in any funds belonging to the Cherokee Nation except where such funds were derived by lease, sale, or otherwise from the lands of the Cherokee Nation conveyed to it by the United States by the patent of December, 1838; and that the rights and privileges of those white citizens who intermarried with Cherokee citizens subsequent to the first day of November, 1875, do not extend to the right of soil or interest in any of the vested funds of the Cherokee Nation, and such intermarried persons are not entitled to share in the allotment of the lands or in the distribution of any of the funds belonging to said Nation, and are not entitled to be enrolled for such purpose; that those white persons who intermarried with Delaware or Shawnee citizens of the Cherokee Nation either prior or subsequent to November 1, 1875, and those who intermarried with Cherokees by blood and subsequently being left a widow or widower by the death of the Cherokee wife or husband, intermarried with persons not of Cherokee blood, and those white men who have married Cherokee women and subsequently aban-

doned their Cherokee wives have no part or share in the
Cherokee property, and are not entitled to participate in the
allotment of the lands or in the distribution of the funds of
the Cherokee Nation or people, and are not entitled to be
enrolled for such purpose."

Cherokee citizens by blood took an appeal to this court
from so much of that decree as adjudged that persons inter-
marrying with Cherokee citizens prior to November 1, 1875,
were entitled to share in the Cherokee property, which appeal
is numbered in this court 125; and the Cherokee Nation
prosecuted a similar appeal, numbered 126. Then certain
intermarried whites appealed from the decree except that
portion which held that the whites who intermarried prior
to November 1, 1875, were entitled to share, numbered 127.
And thereafter other intermarried whites appealed generally,
numbered 128.

The case is reported in 40 Court of Claims, 411, where will
be found an elaborate statement of the facts, including the
acts of the Cherokee National Council, etc., bearing on the
subject matter.

Mr. *John J. Hemphill*, with whom Mr. *K. S. Murcheson*
was on the brief, for Cherokees by blood.

Mr. *Edgar Smith* for the Cherokee Nation.

Mr. *William T. Hutchins* and Mr. *James S. Davenport* for
persons claiming rights in the Cherokee Nation by inter-
marriage.

Mr. *William Henry White*, with whom Mr. *A. E. L. Leckie*
was on the brief, for intermarried whites.

MR. CHIEF JUSTICE FULLER, after making the foregoing
statement, delivered the opinion of the court.

Article 1 of the treaty of 1846 declared "that the lands now
occupied by the Cherokee Nation shall be secured to the

whole Cherokee people for their common use and benefit," and article 4, that these lands "shall be and remain the common property of the whole Cherokee people."

Section 2 of article 1 of the Cherokee constitution (1839) provided that "the lands of the Cherokee Nation shall remain common property."

The amendments of 1866 (Art. 1, sec. 2) declared that the lands of the Cherokee Nation "shall remain common property until the National Council shall request the survey and allotment of the same, in accordance with the provisions of article 20 of the treaty of the nineteenth of July, 1866, between the United States and the Cherokee Nation." This request was subsequently duly made and an allotment is taking place accordingly.

The intermarried whites have not acquired the right to share in the lands or funds of the Cherokee Nation by grant in express terms, but that right is claimed in virtue of an alleged citizenship in the Cherokee Nation derived from intermarriage under Cherokee laws.

The Nation, under the treaties, possessed the right of local self government with authority to make such laws as it deemed necessary for the government and protection of persons and property within the country, belonging to its people, "or such persons as have connected themselves with them." Art. 5, treaty of Dec. 29, 1835, 7 Stat. 478. And section 14 of article 3 of the Cherokee constitution provided: "The National Council shall have power to make all laws and regulations which they shall deem necessary and proper for the good of the Nation, which shall not be contrary to this Constitution."

Prior to 1855 certain white persons had married Cherokees, which had given rise to serious questions respecting the status of these persons and the jurisdiction of the Nation over them. The act of Congress of June 30, 1834 (carried forward into sections 2134, 2135, 2147 and 2148 of the Revised Statutes), provided that a citizen of the United States should not go

into the Indian country without a passport, and that he might be removed therefrom as an intruder. The promise of the United States to remove unauthorized citizens from the Nation appears in the treaties, and even as late as 1893 in the convention by which the Cherokee outlet was ceded to the United States. But the Council could permit certain white persons to reside in the Nation, subject to its laws, though free from the laws relating to intruders.

In these circumstances the Cherokee act of 1855 "regulating intermarriage with white men" was passed. Its purpose is plain and is disclosed by the preamble in these words: "Whereas the peace and prosperity of the Cherokee people required that in the enforcement of the laws the jurisdiction should be exercised over all persons whatever who may from time to time be privileged to reside within the territorial limits of this Nation, therefore," etc. The act was administrative and aimed at subjecting the intermarried whites to the control and dominion of the Cherokee laws instead of leaving them responsible solely to the laws and authorities of the Government of the United States. It contains nothing indicating the intention to confer property rights on intermarried whites. But in respect of the public domain, the Court of Claims, in the present case, because of the opinion in *Journeycake's case*, 155 U. S. 196, assumed that the acquisition of citizenship under Cherokee laws carried the right to share therein, unless forbidden by such legislation. And Mr. Chief Justice Nott, speaking for the court, said: "In 1874 the rapidly growing value of the Cherokee lands was becoming perceptible. On the one hand there were white men who desired to marry into the tribe, and, marrying and residing in the Nation, desired the rights and privileges of citizens; on the other hand there were white adventurers desiring to share in the wealth of the Nation, soon, it was believed, to become available to individual citizens. The public welfare might be benefited by allowing the one, and most certainly would be conserved by excluding the

other. No restriction appeared to exist in the constitution which would forbid the National Council from admitting white men to citizenship upon the condition that they should not acquire an estate or interest in the communal or common property of the Nation."

Accordingly, in 1874 the Cherokee National Council adopted a new code containing sections relating to intermarriage, which became effective November 1, 1875, and carried a provision in article XV, section 75, reading as follows:

"*Provided, also*, That the rights and privileges herein conferred shall not extend to right of soil or interest in the vested funds of this Nation, unless such admitted citizen shall pay into the general funds of the national treasury, a sum of money to be ascertained and fixed by the National Council equal to the '*pro rata*' share of each native Cherokee, in the lands and vested wealth of the Nation, estimated at five hundred dollars, and thereafter conform to the constitution of the Nation, and the laws made or to be made in pursuance thereof, in which case he shall be deemed a Cherokee to all intent, and be entitled to all the rights of other Cherokees."

On November 28, 1877, the Council amended this proviso by striking out all after the words "this Nation" in the second line thereof, so that the proviso read:

"*Provided, also*, That the rights and privileges herein conferred shall not extend to right of soil or interest in the vested funds of this Nation."

The Court of Claims found that the Cherokee law remained unchanged, in this particular, from 1877 to the date of the decree. Something is said about certain compilations of the Cherokee laws of 1880 and 1892, which omitted this part of section 75, but we agree that this omission did not operate to change the existing law, as the acts providing for the compilations did not provide that they should be effective as laws of the Nation, and where an error was committed by the compiler the original law as duly passed and approved must prevail.

Thus it is seen that the privilege of paying $500 into the Cherokee treasury and becoming thereby entitled to "all the rights of other Cherokees" existed only from November 1, 1875, to November 28, 1877. Assuming that the National Council had authority under the Cherokee constitution of 1839 and the amendments of 1866 to confer on white inter-married citizens the privilege of purchasing a right in the soil and funds of the Nation, that privilege was withdrawn in two years and, according to the facts found, was only availed of by two persons, neither of whom was an individual party to the suit. No right in the Nation's property flowed from the Cherokee citizenship act, which merely subjected the white man to the jurisdiction of the Nation, but that right resulted from express grant and the payment of a price. As to the Delawares and Shawnees, their participation was specifically provided for by convention, approved by the United States, and depended upon payments made. As to the Freedmen, their participation in property distribution was secured by the terms of the treaty of 1866 (the result of the civil war), and of the constitutional amendments thereupon adopted. The Court of Claims referred to them thus (p. 441): "These constitutional amendments were brought about by the action of the United States at the close of the civil war in dictating that the slaves or freed persons of color in the Cherokee country should not only be admitted to the rights of citizenship, but to an equal participation in the communal or common property of the Cherokees. The Cherokees seem to have veiled their humiliation by these general declarations of the persons who should be taken and deemed to be citizens. But, be that as it may, the overthrow of the Cherokee Nation and the treaty of peace, 1866, and the terms dictated by the United States, whereby their former slaves were made their political equals and the common property of the Cherokees was to be shared in with their servants and dependants, was in effect a revolution. The constitutional amendment quoted was simply declaratory of the new order

of things. It is not necessarily prospective, and does not impose limitations upon the legislative power with regard to the naturalization or future adoption of aliens as citizens. Under the policy of the Cherokees citizenship and communal ownership were distinct things. The citizen who annually received an annuity derived from the communal fund held by the United States, and the citizen who never received a dollar from the fund or never so much as thought of receiving it, formed a concrete object lesson in constitutional law not easily effaced from the common mind."

Section 5 of the constitution of 1839 was as follows:

"SEC. 5. No person shall be eligible to a seat in the National Council, but a free Cherokee male citizen, who shall have attained the age of twenty-five years.

"The descendants of Cherokee men by all free women, except the African race, whose parents may have been living together as man and wife according to the customs of this Nation, shall be entitled to all the rights and privileges of this Nation, as well as the posterity of the Cherokee women by all free men. No person who is of negro or mulatto parentage, either by the father's or mother's side, shall be eligible to hold any office of profit, honor or trust under this government.

"SEC. 6. The electors and members of the National Council shall in all cases, except those of treason, felony or breach of the peace, be privileged from arrest during their attendance at elections and at the National Council in going to and returning."

The amendment of section 5, in 1866, reads:

"SEC. 5. No person shall be eligible to a seat in the National Council but a male citizen of the Cherokee Nation, who shall have attained the age of twenty-five years and who shall have been a *bona fide* resident of the district in which he may be elected at least six months immediately preceding such election. All native-born Cherokees, all Indians and whites legally members of the Nation by adoption, and all freedmen

who have been liberated by voluntary act of their former owners, or by law, as well as free colored persons who were in the country at the commencement of the rebellion and are residents therein, or who may return within six months from the nineteenth day of July, 1866, and their descendants who reside within the limits of the Cherokee Nation, shall be taken and deemed to be citizens of the Cherokee Nation."

We cannot accept the view that this amendment amounted to a grant of property rights, or operated to enlarge the authority of the National Council in respect of the readmission of former members of the Nation.

The amendment (found in that part of the Constitution in respect to officers and elections) must be taken as a whole, and related to eligibility to a seat in the National Council and not to property rights. The contention that the words "citizens of the Cherokee Nation" should be construed as relating to the constitutional provision of 1839 that the lands of the Nation should be common property, is without merit in view of the provisions themselves.

By section 2 of article 1 of the constitution of 1839 it was provided that "whenever any citizen shall remove with his effects out of the limits of this Nation, and becomes a citizen of any other government, all his rights and privileges as a citizen of this Nation shall cease: *provided, nevertheless*, that the National Council shall have power to readmit, by law, to all the rights of citizenship, any such person or persons who may, at any time, desire to return to the Nation, on memorializing the National Council for such readmission." By its terms this referred to those who had been citizens, and their readmission gave no rights not originally possessed, and this was true under the amendments of 1866. Many special Cherokee laws demonstrate that the Council did not venture to assume nor desire to assume the power to impart to the white adopted citizen other than civil and political rights.

For instance, the acts of 1878, readmitting Greenway and his children, and Allen and his family " to all the rights and

privileges of citizens of the Cherokee Nation" specifically provided that no rights should be acquired except such as attach to white men, "adopted citizens of the Cherokee Nation."

The acts relating to intermarriage with whites contained many restrictions, but by the act in respect of the intermarriage of Cherokees with other Indians no such restrictions were imposed. Cherokee act of Nov. 27, 1880. That act provided that the marriage should be contracted according to the law regulating marriages between "our own citizens," and declared that such Indian "shall be and is hereby deemed a Cherokee to all intents and purposes and entitled to the rights of other Cherokees." There is no such language in the acts relating to intermarried whites.

The treaty of 1866, between the United States and the Cherokee Nation, provided as to the former slaves, that they should be free and they "and their descendants shall have all the rights of native Cherokees."

Article 15 of the same treaty, after providing for the settlement of friendly Indians amongst the Cherokees and the manner in which the latter shall be paid therefor, then stipulates "that they shall be incorporated into and thereafter remain a part of the Cherokee Nation on *equal terms* in every respect with *native Cherokees.*" When the Delawares were about to be moved into the Cherokee country as friendly Indians, it was stipulated in the agreement that "on the fulfilment by the Delawares of the foregoing stipulations, all the members of the tribe registered as above provided, shall become *members* of the Cherokee Nation, with the *same rights and immunities* and the same participation (and no other) in the national funds as *native Cherokees* . . . and the children thereafter born of such Delawares so incorporated into the Cherokee Nation shall *in all respects be regarded as native Cherokees.*" Later when an agreement was made with the Shawnees, after the amount of money to be paid was provided for, the rights of Shawnees were defined as follows: "and that

the said Shawnees shall be incorporated into and ever after remain a part of the Cherokee Nation on equal terms *in every respect* and with all the privileges and immunities of native citizens of said Nation."

These intermarried whites. show no grant of equal rights as members of the Cherokee Nation by treaty or otherwise, nor have they (excepting the two individuals heretofore referred to) paid any sum into the Nation's treasury for a *pro rata* share of its money and lands.

The Delawares, the Shawnees and the Freedmen acquired their property rights by the express words of treaties, but the intermarried whites cannot point out any such in their favor. Doubtless because of this they have heretofore asserted no claim, although the Cherokee courts were open to them to do so, and have allowed repeated payments of money to be made to every other citizen without question.

The distinction between different classes of citizens was recognized by the Cherokees in the differences in their intermarriage law, as applicable to the whites and to the Indians of other tribes; by the provision in the intermarriage law that a white man intermarried with an Indian by blood acquires certain rights as a citizen, but no provision that if he marries a Cherokee citizen not of Indian blood he shall be regarded as a citizen at all; and by the provision that if, once having married an Indian by blood, he marries the second time a citizen not by blood, he loses all of his rights as a citizen. And the same distinction between citizens as such and citizens with property rights has also been recognized by Congress in enactments relating to other Indians than the Five Civilized Tribes. Act August 9, 1888, 25 Stat. 392, c. 818; act May 2, 1890, 26 Stat. 96, c. 182; act June 7, 1897, 30 Stat. 90, c. 3.

In *Whitmire* v. *Cherokee Nation*, 30 C. Cl. 138, 152, the Court of Claims said: "Here it should be noted that when the treaty was made there had long been a peculiar class of citizens in the Cherokee country—white men who became

citizens by intermarriage." And, after quoting the proviso to section 75, art. 15, of the Cherokee Code of 1874, the court added: ":The idea, therefore, existed both in the minds and in the laws of the Cherokee people, that citizenship did not necessarily extend to or invest in the citizen a personal or individual interest in what the constitution termed the 'common property,' 'the lands of the Cherokee Nation.' "

In *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 488, this court, in respect of certain acts of Congress, observed:

"It may be remarked that the legislation seems to recognize, especially the act of June 28, 1898, a distinction between admission to citizenship merely and the distribution of property to be subsequently made, as if there might be circumstances under which the right to a share in the latter would not necessarily follow from the concession of the former."

Referring to this, the Court of Claims said in its opinion in the present case, 40 C. Cl. 411, 442:

"It cannot be supposed for a moment that Congress intended by this legislation to take away from some of the Cherokee people property which was constitutionally theirs or to confer upon white citizens property which they were not legally entitled to have. The term 'citizens' in these statutes of the United States must be construed to mean those citizens who were constitutionally or legally entitled to share in the allotment of the lands."

The doctrine is familiar that the language of a statute is to be interpreted in the light of the particular matter in hand and the object sought to be accomplished as manifested by other parts of the act, and the words used may be qualified by their surroundings and connections.

In accepting the conclusion of the Court of Claims in this regard we, nevertheless, deem it proper to somewhat consider the congressional legislation relied on by the claimants.

The act of Congress of July 1, 1902, 32 Stat. 716, c. 1375, ratified by the Cherokee Nation, August 7, 1902, and often called the Cherokee agreement, contained these sections:

"SEC. 25. The roll of citizens of the Cherokee Nation shall be made as of September first, nineteen hundred and two, and the names of all persons then living and entitled to enrollment on that date shall be placed on said roll by the Commission to the Five Civilized Tribes.

"SEC. 26. The names of all persons living on the first day of September, nineteen hundred and two, entitled to be enrolled as provided in section twenty-five hereof, shall be placed upon the roll made by said Commission, and no child born thereafter to a citizen, and no white person who has intermarried with a Cherokee citizen since the sixteenth day of December, eighteen hundred and ninety-five, shall be entitled to enrollment or to participate in the distribution of the tribal property of the Cherokee Nation.

"SEC. 27. Such rolls shall in all other respects be made in strict compliance with the provisions of section twenty-one of the act of Congress approved June twenty-eighth, eighteen hundred and ninety-eight (Thirtieth Statutes, page four hundred and ninety-five), and the act of Congress approved May thirty-first, nineteen hundred (Thirty-first Statutes, page two hundred and twenty-one).

"SEC. 28. No person whose name appears upon the roll made by the Dawes Commission as a citizen or freedman of any other tribe shall be enrolled as a citizen of the Cherokee Nation.

"SEC. 29. For the purpose of expediting the enrollment of the Cherokee citizens and the allotment of lands as herein provided, the said Commission shall, from time to time, and as soon as practicable, forward to the Secretary of the Interior lists upon which shall be placed the names of those persons found by the Commission to be entitled to enrollment. The lists thus prepared, when approved by the Secretary of the Interior, shall constitute a part and parcel of the final roll of citizens of the Cherokee tribe, upon which allotment of land and distribution of other tribal property shall be made. When there shall have been submitted to and approved by the

Secretary of the Interior lists embracing the names of all those lawfully entitled to enrollment, the roll shall be deemed complete. The roll so prepared shall be made in quadruplicate, one to be deposited with the Secretary of the Interior, one with the Commissioner of Indian Affairs, one with the principal chief of the Cherokee Nation, and one to remain with the Commission to the Five Civilized Tribes.

"SEC. 30. During the months of September and October, in the year nineteen hundred and two, the Commission to the Five Civilized Tribes may receive applications for enrollment of such infant children as may have been born to recognized and enrolled citizens of the Cherokee Nation on or before the first day of September, nineteen hundred and two, but the application of no person whomsoever for enrollment shall be received after the thirty-first day of October, nineteen hundred and two.

"SEC. 31. No person whose name does not appear upon the roll prepared as herein provided shall be entitled to in any manner participate in the distribution of the common property of the Cherokee tribe, and those whose names appear thereon shall participate in the manner set forth in this act: *Provided*, That no allotment of land or other tribal property shall be made to any person, or to the heirs of any person, whose name is on said roll and who died prior to the first day of September, nineteen hundred and two. The right of such person to any interest in the lands or other tribal property shall be deemed to have become extinguished and to have passed to the tribe in general upon his death before said date, and any person or persons who may conceal the death of anyone on said roll as aforesaid for the purpose of profiting by said concealment, and who shall knowingly receive any portion of any land or other tribal property or of the proceeds so arising from any allotment prohibited by this section, shall be deemed guilty of a felony, and shall be proceeded against as may be provided in other cases of felony and the penalty for this offense shall be confinement at hard

labor for a period of not less than one year nor more than five years, and in addition thereto a forfeiture to the Cherokee Nation of the lands, other tribal property, and proceeds so obtained."

It thus appears that the roll of citizens of the Cherokee Nation was to be made up as of September 1, 1902, of the persons then living and entitled to enrollment on that date; that all such persons should be placed upon the roll, and that (section 29) on the lists to be finally approved by the Secretary of the Interior there should be placed only the names of those persons found to be entitled to enrollment. In all other respects the roll was to be made in compliance with section 21 of the act of Congress of June 28, 1898, and of the act of Congress of May 31, 1900.

Section 21 provided: "That in making rolls of citizenship of several tribes, as required by law, the Commission to the Five Civilized Tribes is authorized and directed to take the roll of Cherokee citizens of eighteen hundred and eighty (not including freedmen) as the only roll intended to be confirmed by this and preceding acts of Congress, and to enroll all persons now living whose names are found on said roll, . . . with such intermarried white persons as may be entitled to citizenship under Cherokee laws." The roll of 1880, made by the Cherokees, was a census roll, and its confirmation was not intended to create any rights which citizens of the Cherokee Nation had not before enjoyed, but merely to furnish the basis for making up the roll of citizens. Section 21 was in reality a statement that no previous act of Congress was intended to confirm any other roll of the Cherokee Nation.

The act of May 31, 1900, 31 Stat. c. 598, pp. 221, 236; provided: "That said Commission shall continue to exercise all authority heretofore conferred on it by law. But it shall not receive, consider, or make any record of any application of any person for enrollment as a member of any tribe in Indian Territory who has not been a recognized citizen thereof, and duly and lawfully enrolled or admitted as such, and its refusal

of such applications shall be final when approved by the Secretary of the Interior." Section 31 of the act of July 1, 1902, says that no person whose name does not appear on the roll made by the Commission to the Five Civilized Tribes "shall be entitled to in any manner participate in the distribution of the common property of the Cherokee tribe, and those whose names appear thereon shall participate in the manner set forth in this act." In other words, the roll must be made up of citizens who under the laws of the Cherokee Nation were entitled to participation in the distribution of the common property of the Cherokee tribes.

The concluding words of section 21, "with such intermarried white persons as may be entitled to citizenship under Cherokee laws," emphatically indicate that Congress had the Indian citizen in mind in all that went before and limited enrollment of white persons to such as might be entitled to citizenship under Cherokee laws.

Counsel for claimants speak of the act of 1902 as a "treaty," but it is only an act of Congress and can have no greater effect. It is a singular commentary on the situation that the majority of the native Cherokees voted against its acceptance, which was carried by the vote of the whites. The suggestion is wholly inadmissible that they could vote themselves an interest in the property of the Cherokee people, including a share in the money paid in by the Delawares and the Shawnees, and become thereby wards of this Government.

Referring to section 26 of the act of 1902, which declares that no white person intermarried since December 16, 1895, shall be entitled to enrollment or to participate in the distribution of the tribal property of the Cherokee Nation, and to an act of the Cherokee Council to the same effect, approved December 16, 1895, counsel contend that the act of Congress shows that there was a class of persons who, having married prior to December 16, 1895, were to be enrolled, embracing all lawfully married according to the law of the Nation, and were to participate in the distribution of the tribal property.

The doctrine that the denial of a right is the grant of a right is a poor basis for a grant of land. Not a single word of the act intimates that these intermarried persons have or are to have any interest in the property of the Nation, and to hold that because the act of 1902 declares that white persons intermarrying after 1895 should acquire no property rights the Indians in accepting the act conceded property rights to all who intermarried prior thereto, would put a construction on the act utterly inconsistent with the settled rule that as between the whites and the Indians the laws are to be construed most favorably to the latter.

After the decision in *Journeycake's case*, 155 U. S. 196, and in that of *Whitmire*, 30 C. Cl. 138, 180, the Cherokee National Council passed the act of December 16, 1895, amending certain sections of the compiled laws, from which the provisions of the act of November, 1877, which denied intermarrying whites any right in Cherokee property, had been erroneously omitted, by reënacting the same, but this only evidenced the determination to prevent the encroachment of the whites upon the property rights of the Cherokee people. The act was clearly passed out of abundant caution and was quite unnecessary in view of the fact that the act of 1877 remained in force, as was found by the Court of Claims.

We are dealing with the right of enrollment so as to entitle the persons enrolled to participate in the distribution of the lands and vested funds of the Cherokee Nation, and not with questions arising in respect of improvements on the public domain. As to improvements they seem to have been treated as those of a tenant who had made them under an agreement that they should remain his. Any citizen of the Nation could use the public domain and it is not asserted that the intermarried whites failed to obtain their share of such use, but because they have enjoyed that benefit, free from tax or burden, is no reason for giving them a share in the lands and vested funds, which has never been granted to them and for which they have never paid.

We concur in the conclusions of the Court of Claims, including the disposition of the particular contention presented in appeal No. 128.

This involved certain claimants, before the court, known as "married out and abandoned whites," who alleged that they became citizens of the Cherokee Nation by intermarriage, but conceded that they had since married persons having no rights of Cherokee citizenship by blood, or had abandoned their Cherokee wives. They contended that they could not be deprived of the rights and privileges acquired by intermarriage save by proceedings in the nature of office found. As to this the Court of Claims said (p. 444):

"These intermarried whites are not grantees or devisees seized and in possession of land, occupying the position of defendants. They occupy the contrary position—of plaintiffs seeking to recover money—and it is obligatory upon them to establish their right to it. To say that a white man can share in the property of the Cherokees for the reason that at one time in his life he was the husband of a Cherokee woman, and to say that this court, or the Secretary of the Interior, must hold that he is still the husband of a Cherokee woman because the contrary has not been established in another proceeding, is an appeal to technicality which the court cannot uphold. These claimants, like other plaintiffs, must prove their case; asserting a present right, they must establish present conditions. The laws and usages of the Cherokees, their earliest history, the fundamental principles of their national policy, their constitution and statutes, all show that citizenship rested on blood or marriage; that the man who would assert citizenship must establish marriage; that when marriage ceased (with a special reservation in favor of widows or widowers) citizenship ceased; that when an intermarried white married a person having no rights of Cherokee citizenship by blood it was conclusive evidence that the tie which bound him to the Cherokee people was severed and the very basis of his citizenship obliterated.

"The Cherokee statute which has been cited (Laws of 1892, section 669) gives a proceeding in the nature of office found, but, nevertheless, is confirmatory of the views hereinbefore expressed. It relates to cases where the Cherokee government takes the initiative to accomplish a purpose; that is to say, where an intermarried white man has forfeited his rights of citizenship in the Nation by acts which declare such forfeiture, 'and the Nation requires his removal beyond the limits of its territory,' this proceeding must be resorted to, to be followed by a call on the United States Indian agent 'to remove such a white man.' It is in principle precisely like the common-law procedure of office found, and exists for the same reason—that the Government may exercise a right dependent upon only the alienage of a person living within its territory presumably a citizen."

*Decree affirmed.*