OPINION OF THE COURT

STACY L. LEEDS, Justice.
Petitioner Lucy Allen is a descendant of individuals listed on the Dawes Commission Rolls as “Cherokee Freedmen.” To become a tribal member under the current legislation, she must prove she is “Cherokee by blood.” She asks this Court to declare 11 C.N.C.A. § 12 unconstitutional because it is more restrictive than the membership criteria set forth in Article 111 of the 1975 Constitution.
Sovereign Immunity
Respondent Cherokee Nation asks this Court to follow the United States Supreme Court’s decision in Santa Clara v. Martinez[1] and dismiss this case because the Cherokee Nation is immune from suit. If this case were filed against the Cherokee Nation in a federal or state court, Santa Clara would certainly require dismissal. In fact, when other Cherokee Freedmen have asked the federal courts to enforce their rights under the 1975 Constitution, the federal courts have properly dismissed those lawsuits.[2]
Article VII of the 1975 Constitution, however, created this Court to “hear and resolve any disagreements” arising under the “constitution or any enactments of the Council.” This case involves a direct conflict between the language of the constitution and legislation passed by the Council. The Cherokee JAT is the only proper forum.
The Power of the Cherokee People
The Cherokee citizenry has the ultimate authority to define tribal citizenship. When they adopted the 1975 Constitution, they did not limit membership to people who possess Cherokee blood. Instead, they extended membership to all the people who were “citizens” of the Cherokee Nation as listed on the Dawes Commission Rolls.
*21 The Constitution could be amended to require that all tribal members possess Cherokee blood. The people could also choose to set a minimum Cherokee blood quantum.[3] However, if the Cherokee people wish to limit tribal citizenship, and such limitation would terminate the preexisting citizenship of even one Cherokee citizen, then it must be done in the open. It cannot be accomplished through silence.
The Council lacks the power to redefine tribal membership absent a constitutional amendment. The Council is empowered to enact enrollment procedures, but those laws must be consistent with the 1975 Constitution. The current legislation is contrary to the plain language of the 1975 Constitution.
The 1975 Cherokee Constitution
Article III of the 1975 Constitution defines eligibility for tribal membership very broadly:
All members of the Cherokee Nation must be citizens as proven by reference to the Dawes Commission Rolls, including the Delaware Cherokees of Article II of the Delaware Agreement dated the 8th day of May 1867, and the Shawnee Cherokees as of Article III of the Shawnee Agreement dated the 9th day of June, 1869, and/or their descendants.[4] (emphasis added)
There is simply no “by blood” requirement in Article III. There is no ambiguity to resolve. The words “by blood” or “Cherokee by blood” do not appear.
Article III only requires proof of citizenship by referencing the “Dawes Commission Rolls.” Article III does not exclude anyone who is listed on the Dawes Commission Rolls.
It is important to note that the phrase “Dawes Commission Rolls” is plural. While the overwhelming majority of people on the Dawes rolls are Cherokee by blood, the rolls also include other people who the Cherokee Nation recognized as citizens at the time the Dawes rolls were compiled. Membership is not limited, in Article III, to those individuals only appearing on the “Cherokee by blood” pages of the Dawes rolls.
In the dissenting opinion, Chief Justice Matlock agrees with the majority on one very crucial point: “The Cherokee Freedmen. Delaware Cherokee and Shawn,ee Cherokees were citizens of the Cherokee Nation prior to the adoption of the 1975 Constitution of the Cherokee Nation." If the Cherokee Freedmen were “citizens” in 1975, as all three justices unanimously agree, then they must have been “citizens” at the time the Dawes Rolls were completed. If they were citizens of the Cherokee Nation at the time the Dawes Rolls were compiled, then they are expressly included in the 1975 Constitution, which extends membership to the “citizens” on the Dawes Rolls.
If the Freedmen’s citizenship rights existed on the very night before the 1975 Constitution was approved, then they must necessarily survive today. These rights were not terminated by the adoption of the 1975 Constitution. In fact, the 1975 Constitution affirms these rights by linking citizenship to one single document: the Dawes Commission Rolls.
The Disputed Legislation
The disputed legislation sets forth “membership requirements” in 11 *22 C.N.C.A. § 12. These “membership requirements” are more restrictive than the “membership” provision of Article III. 11 C.N.C.A. S .12 states:
A. Tribal membership is derived only through proof of Cherokee blood based on the Final Rolls.
B. The Registrar will issue tribal membership to a person who can prove that he or she is an original enrollee listed on the Final Rolls by blood or who can prove to at least one direct ancestor listed by blood on the Final Rolls.
This legislation adds new and more restrictive membership requirements than those found in the Constitution. The legislation in subsection (A) states that “tribal membership is derived onkj through proof of Cherokee blood.” This is contrary to the plain language of the Constitution.
In subsection (B), the legislation requires proof of lineage “by blood” This too is contrary to the plain language of Article III, which lacks any “blood” requirement whatsoever. The Constitution only requires proof of lineage from a “citizen.” It does not require proof of Cherokee or Indian blood.
Providing proof of Cherokee blood is clearly one way to become a member. It is not the only way to prove membership. In fact, Article III expressly mentions the Shawnee and Delaware, w'ho possess some Indian blood, but not Cherokee blood. The Shawnee and Delaware are not citizens “by blood” of the Cherokee Nation.
Article III expressly includes all people, who can prove that they were “citizens” on the Dawes Commission Rolls with no.mention (one way or the other) about Cherokee or Indian blood quantum. The Cherokee Freedmen, the Shawnee and Delaware were all citizens at the time the Dawes rolls were finalized and they all continue as citizens to this day.
Scope of Additional Inquiry
When interpreting legislation or constitutional provisions, this Court must look at the plain language of the document. If this Court can reach its conclusion by looking at the plain language alone, there is no need to look to additional sources. The language should speak for itself and in this case, it does. Article III does not limit membership to “Cherokees by blood,” but instead, refers to the “citizens” on the Dawes rolls, which include Freedmen. 11 C.N.C.A. § 12, however, requires proof of Cherokee blood where no such requirement is found in Article III. There is no ambiguity and this Court could end the discussion with that simple conclusion. The legislation is unconstitutional.
This Court does, however, recognize that the word “citizen” in Article III might require further discussion so that the Cherokee people fully understand this Court’s decision. For this reason, the Court will engage in a more detailed discussion of legal citizenship in the Cherokee Nation.
This Court will also discuss the 1975 Constitution as a whole, paying particular attention to those provisions in the Constitution that define the rights of Cherokee citizens by blood. The Court will note that under the 1975 Constitution, the rights of Cherokee citizens by blood differ from the rights of the other citizens of the Cherokee Nation.
The Dawes Commission Rolls
The Dawes Commission Rolls were not created by the federal government from scratch. When the Dawes Commission compiled the rolls, they referred to previous Cherokee Nation census records which also included a broad citizenry. Most of the people listed on the Dawes Rolls will *23 also appear on the Cherokee Nation’s own tribally controlled censuses that pre-date the Dawes rolls. The Cherokee Nation’s own censuses included Freedmen in addition to “native Cherokees,” intermarried whites, and Indians of other tribes, all of whom were recognized by the Cherokee Nation as citizens. The 1975 Constitution makes no reference to these tribal rolls, but instead, relies on the Dawes Rolls for inclusion and exclusion.
The Dawes Commission Rolls are the final citizenship rolls of the Cherokee Nation.[5] On the basis of their Cherokee citizenship, the people who were listed on these rolls were entitled to allotments from the Cherokee Nation, including the Cherokee Freedmen. The Dawes Rolls include several groups of people and are not limited to Cherokees by blood.
Individual Shawnees are actually listed on the “Cherokee by blood” pages of the Dawes Commission Rolls. There are no separate Cherokee Shawnee pages. On the census cards, Shawnees are listed with a blood degree and are referenced as “AS” or “Adopted Shawnee.” The Shawnee are Cherokee citizens on the Dawes rolls, but they are citizens by adoption, not “by blood.”
Individual Delaware are listed on separate pages in the Dawes Commission Rolls with the caption “Delaware Cherokee” at the top. On the census cards, the Delaware are listed with a blood degree and are referenced as “AD" or “Adopted Delaware.” The Delaware are Cherokee citizens on the Dawes rolls, but they are citizens by adoption, not “by blood.”
Individual Freedmen, like the Delaware, appear on separate pages with the caption “Cherokee Freedmen” at the top.[6] On these census cards, there is no blood degree listed but there is an “F” or “Freedmen” notation. The Freedmen are Cherokee citizens on the Dawes rolls, but they are citizens by adoption, not “by blood.” The only time the words “by blood” appear in the Dawes Commission Rolls is at the top of the Cherokee by blood pages (which actually includes some Shawnees) and “Minor Cherokees by blood” pages. It is true that the Dawes Commission listed a blood degree on the census cards for Delaware and Shawnee. This degree of blood would refer to Delaware or Shawnee Indian blood, not a degree of Cherokee blood.[7] *24 Therefore, it is incorrect to refer to Delaware and Shawnee as citizens by blood of the Cherokee Nation, even if they possess a CDIB card. The Delaware and Shawnee, like the Freedmen, are citizens of the Cherokee Nation by adoption only.
The Dawes Commission had their own federal purposes for including a blood degree on their documents. The federal government continues to use these blood degrees for their own purposes today.[8] It is not clear that the Dawes Commission had any appreciation for the fact that Indian blood, of the various tribes, is different. Shawnee blood is not Cherokee blood. Delaware blood is not Cherokee blood. It is important for this Court to question whether all these federal blood degrees really matter today, for purposes of Cherokee citizenship laws.
The “blood” degrees of the Dawes Commission are absolutely irrelevant for the purpose of determining who is a legal citizen of the Cherokee Nation of Oklahoma.[9] A ⅛⅜ blood Shawnee has the same legal citizenship rights as a full blood Cherokee Indian. A Cherokee Freedmen has the same legal citizenship rights as ⅛ blood Cherokee Indian. A full blood Delaware Indian has the same legal citizenship rights as a person who is ⅛⅛ Cherokee by our Constitution.
The only time a legal right, under Cherokee law, depends on Cherokee blood, is when a person decides to run for elected office. In that instance, we rely on the blood degree findings of the Dawes Commission to make sure our Principal Chief and Council members are Cherokee blood or less. They are all legal citizens of the Cherokee Nation pursuant to the plain language of citizens by blood. This guarantees Cherokee control of government, but that government is ultimately elected by a larger and more diverse constituency of citizens.
The Cherokee Nation is a Sovereign. The Cherokee Nation is much more than just a group of families with a common ancestry. For almost 150 years, the Cherokee Nation has included not only citizens that are Cherokee by blood, but also citizens who have origins in other Indian nations and/or African and/or European ancestry. Many of these citizens are mixed race and a small minority of these citizens possess no Cherokee blood at all.
People will always disagree on who is culturally Cherokee and who possesses enough Cherokee blood to be “racially” Indian. It is not the role of this Court to engage in these political or social debates. This Court must interpret the law as it is plainly written in our Constitution.
Other Provisions of the 1975 Constitution
This Court must look at all the language in the 1975 Constitution. As this Court has *25 stated, Article III has no “by blood” requirement. There are, however, two other constitutional provisions that actually do impose a “by blood” requirement. Article VI, Section 2 requires the Principal Chief to be a member “by blood”:
The Principal Chief of the Cherokee Nation shall be a citizen of the Cherokee Nation of Oklahoma in accordance with Article III. He shall have been born within the boundaries of the United States of America, its territories or possession; and he shall have obtained the age of thirty (30) years of age at the time of his election and be a member by blood of the Cherokee Nation of Oklahoma. (emphasis added)[10]
Article V, Section 3 requires that Council to be “members by blood:”
The Council shall consist of 15 members, who are members by blood of the Cherokee Nation of Oklahoma, and shall be elected at large.
A “by blood” requirement is only needed, in these two provisions, if there are people who are not citizens by blood. Otherwise, it would be pointless to have a “by blood” requirement to hold office. If everyone was a citizen by blood, then everyone could hold office. The Shawnee, Delaware and Freedmen make up the class of people who are not citizens by blood. They are all citizens by adoption and therefore, ineligible to hold elected office.
The fact that the “by blood” requirement was written into two other provisions of the Constitution, shows that the authors knew exactly what words to use when they intended to restrict a right to “by blood” citizens only. If there was any intent to exclude the Cherokee Freedmen from membership, there should have been the same type of unmistakably dear language.
The laws of the other four tribes that appeared on the Dawes Commission Rolls are not, of course, binding on the Cherokee Nation. The constitutions of the other tribes are instructive, however, in terms of the type of language that would be required to clearly terminate Freedmen citizenship rights.
In 1979, the Muscogee (Creek) Nation adopted a new Constitution that provided: “Each Muscogee (Creek) Indian by blood shall have the opportunity for citizenship in the Muscogee (Creek) Nation.” [11] In doing so, the Muscogee (Creek) Nation excluded Freedmen unless that individual can also prove Creek Indian blood pursuant to Muscogee (Creek) law.
In 1983, the Choctaw Nation of Oklahoma adopted a new constitution that limited membership to “all Choctaw Indians by blood whose names appear on the final rolls of the Choctaw Nation.[12]” In doing so, the Choctaws decided to reference the Dawes Commission Rolls for membership, but they were very clear that they were only using those pages that list “Choctaws by blood.” This clearly excluded the Choctaw Freedmen.
The Chickasaw Nation Constitution restricts citizenship to “Chickasaw Indians by blood” who are listed on the Dawes Commission final rolls.[13] They clarified *26 exactly which portion of the Dawes Commission Rolls that could be referenced.
The language in the Choctaw, Chickasaw and Muscogee (Creek) Nation constitutions makes it unmistakably clear that membership is limited to their citizens “by blood” only. The Cherokee Constitution is a completely different matter. It lacks the type of clear language to terminate the pre-existing citizenship rights of the Freedmen.
The Respondent Cherokee Nation argues that the Cherokee Freedmen are not eligible for membership because they are not specifically mentioned by name in Article III. It is true that the “Cherokee Freedmen” are not mentioned by name in Article III. It is also true that the “Cherokees by blood” are not mentioned by name in Article III. Only the Shawnee and Delaware are listed by name. Are both the “Cherokees by blood” and the “Cherokee Freedmen” included by silence? If not, can one group be included by silence while the other is excluded by silence?
This Court is guided by the principles set forth in DeMoss v. Jones, JAT 96-01, 1998 WL 34067263. In that case, the Court established parameters for how the 1975 Cherokee Constitution should be interpreted.
 According to DeMoss, this Court must interpret the language of Article III as “the people voting upon it” would have understood it in 1975 and “in the sense most obvious to the common understanding at the time of its adoption.” This Court unanimously agrees on one thing: the Cherokees by blood, Cherokee Freedmen, Shawnee and Delaware were all citizens in 1975 on the eve of the adoption of the Constitution. If they were all citizens in 1975, then they all would have been legally entitled to vote. Following the instructions in DeMoss, this Court must consider how each of these groups would have understood the language in Article III at that time.
When the average Cherokee by blood read Article III, there is little doubt what they would have thought. They would have thought they were necessarily included, despite the fact that their group was not specifically mentioned like the Shawnee and the Delaware were. They knew they (or their parents/grandparents) were “citizens” of the Cherokee Nation as listed on the Dawes Commission Rolls.
When the average Cherokee Freedmen read the language of Article III, it is reasonable that they too, would have thought they were included, despite the fact that their group was not specifically mentioned like the Shawnee and Delaware were. They knew their history. They knew they (or their parents/grandparent) were “citizens” of the Cherokee Nation as listed on the Cherokee Dawes rolls.
It is not a requirement that the “Cherokees by blood” or the “Cherokee Freedmen” be specifically mentioned in Article III, like the Shawnee and Delaware were. The “Cherokees by blood” and the “Cherokee Freedmen” were all citizens of the Cherokee Nation when the Dawes Rolls were completed. When Article III stated that “all members of the Cherokee Nation must be citizens as proven by reference to the Dawes Commission Rolls” it expressly included both the Cherokees by blood and the Cherokee Freedmen.
Drafting the 1975 Constitution
The dissenting opinion spends significant time discussing the “intent of the framers.” The dissent improperly focuses on the Preamble of the Constitution rather than on the membership provisions of Article III. The dissent suggests that the individuals who drafted the 1975 Constitution intended to exclude the Cherokee Freed *27 men as a means of preserving tribal culture.[14] The dissent then speaks in terms of “Cherokee Indian identity” and of “common character and ancestry.”
No one disputes that the Shawnee and Delaware are entitled to citizenship in the Cherokee Nation. The Shawnee and Delaware are not, however, Cherokee Indians. They have very different languages and they have a culture of their own. They do not share a common ancestry with each other, or with the Cherokee people. They are, nonetheless, legal citizens of the Cherokee Nation.
If the dissent is correct, in that the 1975 Constitution sought to create an exclusively “Cherokee” Nation for purposing of preserving tribal culture and common ancestry, then why would Indians from other tribes be included?
A truly “Cherokee” Nation, in a strictly cultural sense, might have limited citizenship to Cherokee ancestry and/or required a cultural tie to clan, religion or language. The 1975 Constitution does none of these things. The 1975 Constitution, as it is plainly written, envisions something much more inclusive in terms of qualifications for legal citizenship.
The plain language of the Constitution does not impose a “by blood” requirement. The language of the Constitution controls. The framers did not include a “by blood” requirement when they drafted the Constitution. This Court cannot rewrite the language today.
The dissent’s discussion of the intent of the framers lacks historical context. If this Court is to engage in a retrospective review' of what the framer’s thought, it should also focus on what those people knew, or must have known, about the citizenship status of the Cherokee Freedmen. The individuals who drafted the 1975 Constitution were well-educated" and some were attorneys. They were familiar with Cherokee Nation legal history. When they included a direct reference to the Dawes Commission Rolls in the 1975 Constitution, they knew the Cherokee Freedmen were included in that document.
These individuals were also familiar with Cherokee history under the 1839 Constitution, the Cherokee Nation’s treaties and agreements, and the allotment process. The authors could not have been unaware of the citizenship status of Cherokee Freedmen. At that point in time, the Cherokee Freedmen had been legal citizens of the Cherokee Nation for 110 years.
On the eve of the new 1975 constitution, the Cherokee Nation would have been very mindful of the citizenship rights of Cherokee Freedmen. Those rights had just been the subject of two federal court cases in which the Cherokee Nation participated. Both of these cases were concluded just a few years before the 1975 Constitution was drafted.
(1) In 1967, the United States Court of Claims ruled that the Cherokee Freedmen were entitled to receive payments from the Cherokee Nation judgment fund like any other Cherokee citizen listed on the Dawes Commission Rolls.[15]
(2) In 1971, a small group of individuals who were not listed on the Dawes Commission Rolls tried to; be included in these payments. This group argued that they were Freedmen who were inadvertently. left off the *28 Dawes Rolls. The federal court rejected their claims.[16] Only those Freedmen that are actually listed on the Dawes Rolls were entitled to share in Cherokee Nation funds. This case reaffirms the notion that the Dawes Rolls (in their entirety) are the final citizenship rolls of the Cherokee Nation.
The individuals who drafted the 1975 Constitution would have also been well aware of additional legal realities:
(1) In 1962, Congress passed legislation ordering payments to the Cherokee Nation for prior takings of Cherokee lands. Congress instructed the money to be distributed to individuals on the Dawes Commission Rolls.[17] The Freedmen were paid just like all the other citizens.
(2) No laws changing Cherokee citizenship were passed by the federal or the tribal government between the completion of the Dawes Commission Rolls and the adoption of the 1975 Constitution.
(3) In 1906, the United States Supreme Court heard a challenge about the allotment of Cherokee lands. The U.S. Supreme Court ruled that Intermarried Whites were not entitled to the same citizenship rights (unless they married in before 1875) as the Cherokees by blood, Shawnee, Delaware and Freedmen.[18]
(4) The Cherokee Freedmen were included on the Dawes Commission Rolls and as a result, they received allotments as citizens of the Cherokee Nation. The allotments were not tree grants of land from the United States. The lands were conveyed by the Cherokee Nation and signed by the Principal Chief[19]
(5) In 1895, the United States Court of Claims ruled that Cherokee Freedmen have the same rights as “native” Cherokees and therefore Freedmen were entitled to a share of payments from sales of Cherokee lands. This decision was based on the Treaty of 1866 and tribal amendments to the 1839 Constitution.[20]
(6) In the late 1800s the Cherokee Nation conducted several censuses as a matter of tribal law. The censuses included native Cherokees, Freedmen, adopted whites and various other adopted Indians, including Shawnee and Delaware. The Cherokee census does not list blood degrees for anyone. Blood degrees appeared on the Dawes rolls but not in Cherokee Nation’s own documents.
(7) In the 1870s, the Cherokee Nation Supreme Court (this Court’s predecessor) heard several citizenship cases but never rejected the Freedmen as a class. Some Freedmen were individually rejected because they did not meet residency or tim *29 ing requirements. The Court admitted many individual Freedmen as citizens.[21]
(8) The Cherokee Nation signed a Treaty with the United States in 1866 agreeing to extend citizenship to the Freedmen.
In light of this long and consistent history, the 1975 Constitution was adopted with a membership provision which includes “citizens” and descendants of the Dawes Commission Rolls. If the Cherokee Freedmen are to be treated differently than all the other people on the rolls, then specific language should demonstrate that the Freedmen were being excluded. There is no such language.
Further Discussion of the 1866 Treaty
It has been argued that the Cherokee Freedmen were forced on the Cherokee Nation by the federal government and that the Cherokee Nation never voluntarily accepted the Freedmen as citizens. This is simply not the case.
In the Treaty of 1866, the Cherokee Nation agreed to extend citizenship to Freedmen and agreed to give them the same rights as “native” Cherokees. Although this treaty was signed at the end of the Civil War, when the Cherokee Nation was in a weaker bargaining position, it is nonetheless an agreement between two sovereign nations.
When the Cherokee Nation enters into treaties with other nations, we expect the other sovereign to live up to the promises they make. It is rightly expected that we will also keep the promises we make.
It cannot be overstated that the 1866 Treaty, in which the Cherokee Nation agreed to extend citizenship to the Freedmen is the exact same treaty where the Cherokee Nation agreed to have other Indian tribes (ultimately the Shawnee and Delaware) relocated inside the Cherokee Nation. After the 1866 Treaty, the Cherokee Nation amended the 1839 Constitution to extend citizenship to the Freedmen as a matter of tribal law. After the 1866 Treaty, the Cherokee Nation also entered into individual treaties with both the Delaware and the Shawnee Indian tribes. Both of these actions show that the Cherokee Nation complied with the terms of 1866 Treaty-
The inter-tribal treaties with the Shawnee and Delaware were not as freely negotiated as the Respondent Cherokee Nation contends. First, the United States completed relocation treaties with the Shawnee and the Delaware. Then, the Cherokee Nation agreed with the United States to accept the relocation of the Shawnee and Delaware. Only after making a treaty with the United States did the Cherokee Nation embark on the inter-tribal treaty negotiations with the Shawnee and the Delaware. With the approval of the United States, the inter-tribal treaties set forth that the Shawnee and Delaware Tribes will be incorporated into the Cherokee Nation. This is how individual Shawnee and Delaware came to have citizenship rights in the Cherokee Nation.
The Cherokee treaties with both the Shawnee and Delaware required the approval of the United States with reference to the 1866 Treaty. A freely negotiated treaty between two independent sovereigns does not need the approval of a third sovereign.
It is argued that the 1866 Treaty should not be binding for purposes of Cherokee *30 Freedmen citizenship. The Cherokee Nation argues, however, that the 1866 Treaty (and the resulting inter-tribal treaties that followed) is binding for Shawnee and Delaware purposes.
The Respondent Cherokee Nation asserts that extending citizenship to the Delaware and Shawnee was the Cherokee Nation’s free and independent choice but that the Freedmen were forced on the Cherokee Nation against the will of the Cherokee people. The timing of the treaties does not support this argument. It is not as if the Cherokee Nation approached the United States and asked them to settle some other Indian tribes on lands perpetually that had been guaranteed in fee to the Cherokee Nation. To the contrary, the United States stood in a strong position and needed a place to relocate other Indians and the Cherokee Nation obliged. After these agreements, the Cherokee Nation ultimately extended citizenship to these new citizens just as it had already done with the Freedmen.
If the 1866 Treaty is enforceable for the ultimate inclusion of Shawnee and Delaware it must be enforceable as to the Freedmen. The fact that internal Cherokee laws were amended to acknowledge the Cherokee Nation’s compliance with the 1866 Treaty should not be ignored.[22]
This case poses an interesting question of whether the Cherokee Nation, like other sovereigns, has the internal power to unilaterally abrogate treaties. This Court sees no reason why the Cherokee Nation must be bound by a treaty until the end of time, particularly when that treaty has been broken by the other sovereign.
However, if the Cherokee Nation is going to make a decision not to abide by a previous treaty provision, it must do so by clear actions which are consistent with the Cherokee Nation Constitution. A treaty provision cannot be set aside by mere implication. This treaty discussion leads to the same conclusion as the constitutional discussion. If the Cherokee people want to change the legal definition of Cherokee citizenship, they must do so expressly.
Dec lai ing Legislation Unconstitutional
This Court has been given clear guidance, in two cases, for when legislation must be set aside as unconstitutional. (1) McLain v. Cherokee Nation Election Commission and (2) Leach v. Tribal Election Commission. Both of these cases were binding precedent at the time Riggs v. Ummerteskee was decided and they are good law today. There is no need to cite to the laws of other jurisdictions to interpret the 1975 Cherokee Constitution. Cherokee law controls Cherokee citizenship.
In McLain v. Cherokee Nation Election Commission, JAT 98-13, 1 Am. Tribal Law 38, 1998 WL 34067271 (1998), this Court set aside a legislative act which imposed a residency requirement on candidates.[23]
*31 The Court found that the legislation placed a “more stringent restrictions on candidates for office than are required by the Cherokee constitution.” As a result, the legislation was unconstitutional. In that case, there was no express residency requirement in the Constitution. In the present case, there is no express “by blood” requirement for citizenship in the Constitution.
In Leach v. Tribal Election Commission, JAT 94-01, 1995 WL 1073440, this Court reached the same conclusion. “Any legislative acts that would establish requirements over and above those in the constitution are “contrary” to the constitution, and as such, are unconstitutional.” In the present case, the legislation requires individuals to prove they possess Cherokee blood. This goes over and above the proof required by the Constitution.
The Riggs Decision
In Riggs v. Ummerteskee, JAT 97-03, 3 Am. Tribal Law 10, 2001 WL 36155524 (2001), this Court ruled that 11 C.N.C.A. § 12 was constitutional. At the time Riggs was decided it was a case of first impression under the 1975 Constitution. The Riggs Court was presented with federal court decisions that had repeatedly upheld the citizenship rights of Cherokee Freedmen class. Those federal decisions were based on the federal treaty interpretation, federal interpretation of the 1839 Cherokee Constitution, and the federal documents from the Dawes Commission.
I agree with the Riggs Court on one point: citizenship is an internal matter for the Cherokee citizenry to ultimately decide. I do not fault the Riggs Court for basing their decision solely on the 1975 Constitution. I must, however, respectfully disagree with the Riggs Courts interpretation of the Constitution. The conclusion of Riggs Court is contrary to the plain language of Article III of the 1975 Constitution. If Article III was intended to limit membership to citizens “by blood”: it should have said so.
The principle of stare decisis,[24] which gives strong weight to the prior decisions, has been the norm in this jurisdiction and I respect the predictability it provides. The Riggs Court, however, failed to apply previous precedents for interpreting the constitution as set forth in Leach v. Tribal Election Commission and McLain v. Cherokee Nation Election Commission.
Leach and McLain require a legislative act be held unconstitutional if it adds new requirements to a constitutional provision. 11 C.N.C.A. § 12 adds a “by blood” requirement that simply does not exist in Article III.
11 C.N.C.A. § 12 is hereby deemed unconstitutional. This Court’s decision in Riggs v. Ummerteskee is hereby reversed.
IT IS SO ORDERED.

. 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

. See Nero v, Cherokee Nation of Oklahoma, 892 F.2d 1457 (10th Cir.1989).

. The people of the United Keeloowah Band and the Eastern Band of Cherokee Indians have done so.

. Cherokee Constitution of 1975, Article III, Section I.

.The cover page to the Dawes Commission Rolls reads: "Index to the Final Rolls of the Citizens and Freedmen of the Five Civilized Tribes in Indian Territory.” Respondents argue that this title suggests that the Freedmen were not citizens of the Cherokee Nation. There are at least two reasons for the distinction.
First, not all of the Five Tribes recognized the Freedmen as citizens of their nations. Unlike the other tribes, the Chickasaw never adopted the Freedmen as citizens by amending their own tribal laws. Choctaw Nation v. United States, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943). All of the other tribes, including Cherokee, adopted the Freedmen by amending their tribal laws or constitutions.
Second, the Curtis Act mentioned Freedmen separately from other citizens as a result of the Whitmore federal court case dealing with the distribution of Cherokee Nation funds to Freedmen, as Cherokee citizens. As a result of the Whitmore case, in which Freedmen citizenship rights were upheld, a new Freedmen roll was to be taken to ensure that only those individuals who met the qualifications for citizenship would be included on the rolls. The Curtis Act specifically mentions this litigation. It is unreasonable to argue that the Curtis Act deprived Freedmen of citizenship when it specifically refers to a court case that upheld Freedmen citizenship.

. There are also pages that list "Minor Cherokee Freedmen.” There are no separate pages for Shawnee, Delaware or Intermarried White minors.

. If some of the Shawnee or Delaware were also mixed Cherokee, there is no way to confirm it on the Dawes rolls. Likewise, if some *24 of the Cherokee Freedmen were mixed with Cherokee, there is no way to confirm it on the Dawes rolls. It is inconceivable that not a single Delaware, Cherokee Freedmen, or Shawnee had any Cherokee blood, yet that is what the Dawes rolls suggests.

. We continue to lose more and more of our land base every year because the federal government only protects against alienation the lands owned by individuals with high blood degrees. When lands are owned by Cherokees with less Indian blood, those lands are subjected to state taxation and vulnerable to state eminent domain. The federal and state governments benefit when Cherokee blood quantum drops. Federal protection of our lands cease and state regulatory authority begins.

. The federal government might have a purpose for the blood quantum in the administration of services or for determining who is an ‘‘Indian’' by their standards. This has no effect on legal citizenship status Under Cherokee law.

. This provision has been changed, through constitutional amendment, to add a residency requirement for the Principal Chief.

. Constitution of the Muscogee (Creek) Nation, Art. II, Section 1 (1979).

. Constitution of the Choctaw Nation of Oklahoma, Article II, Section 1 (1983).

.Constitution of the Chickasaw Nation, Article II, Section 1 (1990). The Chickasaw have always contested the inclusion of the Freedmen and unlike the other tribes, they never amended their constitution or passed new tribal laws extending citizenship to Freedmen following their post-Civil war treaty.

. This argument was not presented by either party to this lawsuit.

. Cherokee Nation v. US, 180 Ct.Cl. 181 (1967) affirming 12 Ind. Cl. Comm. 570 (1963) (the Cherokee Nation was the Plaintiff that, initiated this lawsuit).

. Cherokee Freedmen & Cherokee Freedmen's Association v. the United States and the Cherokee Nation, 195 Ct.Cl. 39, 1971 WL 17825 (1971)(the Cherokee Nation was a named Defendant to this lawsuit).

. Public Law 87-775 (October 9, 1962).

. Red Bird v. United States, 203 U.S. 76, 27 S.Ct. 29, 51 L.Ed. 96 (1906). The Respondent Cherokee Nation argues that if this Court allows Freedmen citizenship, then there will also be Intermarried Whites that would be entitled to citizenship. If there are any Intermarried Whites still living, that are listed on the Dawes Rolls, they would be entitled to citizenship. Keep in mind that these people would have been married to native Cherokees on or before 1875. To the extent that they have lineal descendants, those children would likely be the product of a marriage with a Cherokee person and those children would be Cherokees by blood.

. These conveyances were the result of the 1902 Agreement in which the Cherokee Nation agreed to allot the Cherokee lands to individual citizens.

. Whitmire v. Cherokee Nation, 30 Ct.Cl. 138, 1895 WL 708 (1895).

. The dissent argues that there is no instance were the Cherokee Nation voluntarily extended citizenship to the Freedmen. This is inaccurate. The Cherokee Nation Supreme Court extended citizenship to Freedmen as a matter of Cherokee law, based on a Cherokee amendment to the i 839 Cherokee Constitution.

. Petitioner argues that the 1839 Constitution was amended to extend citizenship rights to the Freedmen. Respondent Cherokee Nation argues that this amendment was not properly adopted. We cannot address whether it was properly adopted or not. That would have been the role of the Cherokee Nation Supreme Court at that time. We note, however, that Cherokee Nation Supreme Court did extend citizenship to the individual Freedmen who met the requirements under the treaty and under tribal law.

. The 1975 Constitution has now been amended to include a residency requirement. The constitutional amendment did not go into effect until it was adopted by the people and obtained federal approval, as required by the language of the 1975 Constitution.

. Stare decisis is Latin for “to stand by thin gs decided.’’